NO. 12-01-00242-CR



IN THE COURT OF APPEALS



TWELFTH COURT OF APPEALS DISTRICT


 

TYLER, TEXAS


 


LAVERNE FIELDS,
§
 APPEAL FROM THE 114TH

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 SMITH COUNTY, TEXAS






MEMORANDUM OPINION


 Laverne Fields ("Appellant") appeals her conviction for murder. In four issues, Appellant
contends that the trial court erred in its admonishment of Appellant and in commenting on the weight
of the evidence. Further, Appellant asserts that the evidence is not legally or factually sufficient to
support her conviction. We affirm.


Background

 Appellant married Calvin Fields ("Calvin") on August 29, 1998. On September 27, 1999,
Calvin died at his residence of a gunshot wound to the head. Appellant was charged by indictment
with murder, a first degree felony, and with using a deadly weapon, a firearm, during the commission
of the offense. Appellant pleaded not guilty and a jury trial began on July 30, 2001.

 At trial, Major Bobby Garmon ("Garmon"), an officer with the Smith County Sheriff's
Department, identified a tape of a 911 call received by the sheriff's department on September 27,
1999. On the tape, Appellant's voice was heard telling the 911 operator that "my husband shot
himself." Judge Mitch Shamburger ("Judge Shamburger"), a justice of the peace, testified that he
responded to the scene of the shooting. When he arrived at the scene, he found Calvin lying, face
up, with a large amount of blood coming from his nose and mouth. Shamburger did not notice an
exit wound. Initially, Calvin's death was considered a suicide, and his body was released and
embalmed. When Shamburger learned that an entrance wound was discovered in the back of
Calvin's head, he ordered an autopsy.

 Detective Cecil Cox ("Cox"), an investigator for the Smith County Sheriff's Department, was
dispatched to Appellant's house with the preconception that the incident was an apparent suicide.
When Cox arrived, Appellant was wearing a housecoat that had blood on it. Although Cox observed
in a report that the blood on Appellant's housecoat appeared as if she had performed CPR, he did
not observe any blood around Appellant's nose and mouth consistent with CPR. From the condition
of Calvin's face, Cox believed the wound was self-inflicted and failed to find a wound in the head.
He collected a .9 millimeter pistol and spent shell casing at the scene. The pistol had a blood stain
on it, a bullet was still in the chamber, and the pistol was jammed, characteristic of a weak grip
associated with females. No usable fingerprints were found on the gun. The spent shell casing was
matched to a .9 millimeter gun. Within two days, Cox learned that an entrance wound was found
in the back of Calvin's head. Three days after the incident, Cox collected bedding and Appellant's
housecoat although these items had been washed. A presumptive test to determine the presence of
blood on the housecoat was negative. Cox was unable to perform a test for the presence of gunshot
residue on Calvin or Appellant because the test must be conducted within certain time constraints.
Toxicology tests on Calvin's liver were negative for any drugs. Based on his knowledge of the case,
Cox believed Calvin's death was a homicide. In his opinion, the gun was not in contact with
Calvin's head when fired. However, Cox admitted that there was no gunshot residue, no bloodstain
evidence, and no fingerprints connecting Appellant to Calvin's shooting.

 Edward Stephen Bolesta, M.D. ("Bolesta"), a pathologist, performed an autopsy on Calvin,
unimpeded by the embalming process. Bolesta observed a gunshot entrance wound near the center
of the back of the head with the main projectile traveling without left to right deviation. In a dexterity
test, Bolesta was physically able to take a firearm, hold it to the back of his head, pull the trigger, and
achieve this particular wound path. Glenn Johnson ("Johnson"), the laboratory supervisor of the
regional Texas Department of Public Safety Crime Lab in Tyler, Texas, was unable to match the
copper jacket bullet fragment from Calvin's body to the gun recovered at the scene although the
fragment was consistent with a .9 millimeter bullet. The fired cartridge case was matched to the gun. 
In Johnson's opinion, the muzzle was approximately three to six inches from the back of Calvin's
head at the time it was fired. 

 Bob Henderson ("Henderson"), a crime scene reconstruction and blood stain analysis expert,
testified that he failed to observe expected blood spatter on the back of Calvin's hand or arm. Based
on all the evidence presented to him, Henderson did not believe that Calvin was on his stomach, that
he could have used both hands to shoot himself, or that the evidence was consistent with CPR being
performed. Henderson was unable to position a gun to the back of his head while lying on his
stomach. In his opinion, this incident was a homicide based on the position of the body, the origin
of the head where the gunshot wound was received, the blood stain evidence, the indentation of the
pillow, the location of the body, the swipe patterns, and the fact that the wound was not a hard
contact wound. Allen Weckerling ("Weckerling"), an expert using a scanning electron microscope,
performed a microchemical analysis of three fingernails from Calvin's right hand, but found no
gunshot residue. 

 Dr. Tynus William McNeel ("McNeel"), a psychiatrist specializing in addiction and forensic
or legal psychiatry, reviewed Calvin's medical records and information regarding this case, and
found nothing to indicate that Calvin fell into any of the categories considered at high or even near
a high risk for suicide. Dr. Kenneth Cushman ("Cushman"), a family practitioner in Tyler, Texas,
had diagnosed Calvin with diabetes. Dr. Gene Mark Lee Earl, Jr. ("Earl"), a diagnostician in Tyler,
Texas, treated Calvin for symptoms related to low blood pressure and prescribed Paxil, an
antidepressant, for panic disorder, depression, anxiety, and to support his blood pressure. Although
Calvin exhibited anxiety, neither Cushman nor Earl diagnosed Calvin with a mental disease or
identified him as an alcoholic or drug abuser.

 Judge Shamburger and Cox testified that the most frequent location of intentional gunshot
suicides in descending order are temple, in the mouth, under the chin, and the chest. Although
Henderson testified similarly, he ranked gunshot suicides to the temple and under the chin higher
than in the mouth or to the chest. None of them had seen a gunshot suicide wound to the back of the
head, and Judge Shamburger and Cox recalled only one non-contact gunshot suicide wound. 
Bolesta, Johnson, and Earl testified that shooting oneself in the back of the head was not common.

 Nell Roy ("Roy"), Calvin's mother, testified that, on the Friday before his death, she refused
to help Calvin get a lawyer. However, on the day before his death, Calvin was happy. After his
death, she observed blood on Appellant's housecoat and testified that she and Appellant gathered
the bedding for washing the next day. Garrett Orlando Floyd ("Floyd"), a special agent with the
Federal Bureau of Investigation in Tyler, Texas, interviewed Calvin on September 24, 1999
regarding the cash sale of Calvin's property to a person within a crack cocaine distribution
organization that involved his daughter. Calvin was notified that he had been granted immunity from
any prosecution and cooperated fully with Floyd. At their sole meeting, Calvin was very talkative,
discussing his long-term disability and a truck he was attempting to restore. 

 Mary Ann Fields Rambus ("Rambus"), Calvin's older sister, testified that she spoke to Calvin 
by telephone on the night before his death. Calvin was planning to host the Thanksgiving holiday
and discussed his future work options and working on his military disability benefits. Ladene Owens
("Owens"), a cousin and co-worker of Calvin's, testified that she had a conversation with Calvin
about his employee benefits at The Trane Company ("Trane"). During the conversation, Calvin told
Owens that he wanted to change the beneficiary on his Trane insurance papers from his mother, Roy,
to his wife, Appellant. He stated that Appellant said she would leave him if he did not change the
beneficiary. Robert Rhodes ("Rhodes"), benefits administrator for Trane in Tyler, Texas, testified
that, on September 22, 1999, Calvin changed his beneficiary for all Trane insurance policies and
other benefits to Appellant, and, as a result of Calvin's death, Appellant received some cash.
Although Appellant was also entitled to the proceeds of a life insurance policy that lacked a suicide
exclusion, no monies had been paid at the time of trial. Charles Williams ("Williams"), Appellant's
ex-husband, testified that, approximately two to three years ago, he met Appellant at her place of
work. Appellant stated that she did not really like Calvin, that he was very controlling and mean,
that she would pack up her children, move to Austin, and "basically kill her husband." Appellant
also stated that she would receive an amount of money, but did not articulate to Williams under what
circumstances she would acquire this money.

 Appellant testified to her version of the incident. On the morning of September 27, 1999,
according to Appellant, Calvin was in the couple's bedroom. Appellant testified that Calvin
promised Appellant's daughter that he would take her to McDonald's that afternoon. When
Appellant returned from sending her oldest children to school around 7:15 to 7:30 that morning,
Calvin told her to get his morning medications. Because he could not take the medication on an
empty stomach, she offered to make him breakfast and left the bedroom to begin the meal. Calvin
called Appellant back to the bedroom twice to tell her that he loved her. The third time Calvin called
her back, he insisted she wake up her youngest son. Because she did not want to upset Calvin, she
woke up her son, took him to the living room, laid him on the sofa, and put a movie on for him.
When Appellant walked back up the hallway to make coffee, she heard a noise. She stated that it
sounded like an explosion or something bursting. She went to the bedroom, opened the door, and
observed Calvin lying flat on his stomach with his head facing the bedroom door. When Appellant
could not get him to respond, she called 911 and attempted CPR. She was unable to turn Calvin
over, but could not recall if he was still on his stomach when she left. She ran next door to get help.
A man came and helped her turn Calvin over for CPR. Although she tried, CPR was unsuccessful. 

 Appellant testified that Calvin was employed by Trane. She testified that they fought over
money problems. Appellant described Calvin as very jealous and stubborn, although not controlling,
but later contradicted herself. After their marriage, Calvin's health began to fail because he was a
diabetic and did not follow his doctor's directions. Appellant gave conflicting testimony regarding
whether blood was on Calvin's mouth and stated that she had blood on her garment, mouth, and
hands from trying to perform CPR. Appellant told the grand jury that Calvin's blood was jelly-like,
or had coagulated when she first tried to turn Calvin over. Although she knew the location of
Calvin's right hand in a courtroom demonstration, she testified to the grand jury that she knew the
position of his left hand, but not his right hand. She did not recall telling the grand jury that she first
saw the gun when she rolled Calvin over and that it was underneath him.

 Appellant denied pressuring Calvin to change his beneficiary on the Trane insurance policies
and other benefits. Appellant also gave conflicting testimony regarding when she began living with
another man after Calvin's death. Further, Appellant knew where Calvin kept the gun recovered at
the scene in the bedroom. Appellant admitted convictions for unlawful carrying of a weapon, theft
by check, and harassment. At trial, she contested the accuracy of the grand jury transcript and stated
she believed that Garmon, Rambus, Owens, Rhodes, and Williams lied in their trial testimony. She
also believed Henderson was wrong. She testified that she loved Calvin, denied shooting him, and
insisted that he committed suicide.

 On August 3, 2001, the jury found Appellant guilty of murder, a first degree felony, as
charged in the indictment. (1) Appellant elected for the court to assess punishment. On August 9,
2001, the court assessed punishment at ninety years of imprisonment and a fine of $10,000. (2) This
appeal followed.


Self-incrimination

 In her first issue, Appellant contends that the trial court coerced her into testifying instead
of admonishing her on her right to remain silent. Appellant argues that the trial court egregiously
erred when the judge told Appellant that it was his desire that she testify. She characterizes his
statement as a direct request to Appellant, if not an instruction. The State argues that Appellant
voluntarily took the witness stand after being called by her counsel and that there is no evidence that,
but for the court's statement, Appellant would not have testified.

Analysis

 In a criminal prosecution, the accused shall not be compelled to give evidence against herself.
Tex. Const. art. 1, § 10; Bryan v. State, 837 S.W.2d 637, 643 (Tex. Crim. App. 1992), abrogated
on other grounds, 991 S.W.2d 849, 853 (Tex. Crim. App. 1999). However, this right may be waived
if it is done knowingly, voluntarily, and intelligently. Bryan, 837 S.W.2d at 643. Further, when an
accused voluntarily takes the stand, she waives her privilege against self-incrimination. Hernandez
v. State, 506 S.W.2d 884, 886 (Tex. Crim. App. 1974). However, waiver is not voluntary if the
accused is physically or mentally compelled to testify. Henderson v. State, 13 S.W.3d 107, 110
(Tex. App.-Texarkana 2000, no pet.).

 Appellant was called to the stand to testify by her counsel and sworn in. Counsel requested
the court admonish her and the court agreed. Appellant was called to the bench for her
admonishment. The judge began by stating, "Ms. Fields, I'd like you to testify on your own behalf."
Then, the judge reminded Appellant that she had waived her Fifth Amendment rights and proceeded
to explain what that waiver entailed regarding cross-examination by the State. Appellant
acknowledged that her attorney had advised her as to the risks and rewards of testifying and stated
that she was still willing to testify. Further, Appellant agreed that she was testifying freely and
voluntarily. 

 When she voluntarily took the stand, Appellant waived her privilege against self-incrimination. See Hernandez, 506 S.W.2d at 886. Although the judge stated that he would "like
[her] to testify," this comment cannot be considered a direct request or instruction because Appellant
had already taken the stand. Further, the court continued by admonishing Appellant and confirmed
that she was testifying freely and voluntarily. Because the judge's comment did not compel her to
take the stand and testify, Appellant's waiver of her privilege against self-incrimination was
voluntary. Therefore, Appellant's first issue is overruled. 


Comment on Weight of Evidence

 In her second issue, Appellant contends that the trial court erred when it commented on the
weight of certain evidence. The State argues that any error was cured by instructions in the jury
charge. Further, the State contends that Appellant failed to preserve error at trial and, therefore,
waived this issue on appeal.

Applicable Law

 A trial judge shall maintain an attitude of impartiality throughout the trial. Clark v. State,
878 S.W.2d 224, 226 (Tex. App.-Dallas 1994, no pet.). In ruling upon the admissibility of evidence,
a judge must not discuss or comment upon the weight of the evidence or its bearing, but shall simply
decide whether or not it is admissible. Tex. Code Crim. Proc. Ann. art. 38.05 (Vernon 1979).
Further, a trial court has a duty to conduct itself so as to ensure a fair trial for both the state and the
accused. Tex. Code Crim. Proc. Ann. art. 2.03(b) (Vernon 1977); Bethany v. State, 814 S.W.2d
455, 456 (Tex. App.-Houston [14th Dist.] 1991, pet. ref'd). "[I]n determining whether an
instruction is a comment on the weight of the evidence, [a reviewing court should] assess the
probable effect of the instruction on the jury in the context in which it was given." O'Connell v.
State, 17 S.W.3d 746, 748-49 (Tex. App.-Austin 2000, no pet.) (quoting Russell v. State, 749
S.W.2d 77, 79 (Tex. Crim. App. 1988)). The trial court's comment constitutes reversible error if
such comment is either reasonably calculated to benefit the state or to prejudice the defendant's
rights. Sharpe v. State, 648 S.W.2d 705, 706 (Tex. Crim. App. 1983); Fletcher v. State, 960 S.W.2d
694, 701 (Tex. App.-Tyler 1997, no pet.).

 In order to present an issue for appellate review, the record must show that a complaint was
made to the trial court by a timely request, objection, or motion. Tex. R. App. P. 33.1(a)(1). The
request, objection, or motion must state the grounds for the ruling that the complaining party sought
from the trial court with sufficient specificity to make the trial court aware of the complaint. Tex.
R. App. P. 33.1(a)(1)(A). The trial court must have ruled on the request, objection, or motion, either
expressly or implicitly. Tex. R. App. P. 33.1(a)(2)(A). If the trial court refused to rule, the
complaining party must have objected to the refusal. Tex. R. App. P. 33.1(a)(2) (B). 

 Although an accused has a right to a trial free from a trial court's comments on the evidence,
an accused's failure to object constitutes a waiver of his complaint on appeal. Gibbs v. State, 7
S.W.3d 175, 178 (Tex. App.-Houston [1st Dist.] 1999, pet. ref'd); see Williams v. State, 834 S.W.2d
502, 505 (Tex. App.-Fort Worth 1992, pet. ref'd). Any error is also waived by a failure to timely
and properly object to a trial judge's comment. Sharpe, 648 S.W.2d at 706; Mestiza v. State, 923
S.W.2d 720, 724 (Tex. App.-Corpus Christi 1996, no pet.). However, if error is not waived, a jury
instruction by a judge to disregard any comments made by him is generally sufficient to cure the
error, if any. Marks v. State, 617 S.W.2d 250, 252 (Tex. Crim. App. [Panel Op.] 1981). 

Analysis

 During trial, the judge told the jury that Owens would be giving testimony that "the best [he
could] tell, does concern a conversation that she and Mr. Fields had at some point prior to the date
of his demise." Regarding that conversation, the judge instructed the jury that they could consider
Owens's testimony regarding Calvin's statements only in regard to his state of mind, but not to prove
the truth of the matter asserted. In the charge, the court instructed the jury, both orally and in
writing, as follows:


 The Court has no right by any word or any act to indicate any opinion respecting any matter of fact
involved in this case, nor to indicate any desire respecting its outcome. The Court has not intended to
express any opinion upon any matter of fact in this case, and if you have observed anything which you
have or may interpret as the Court's opinion upon any matter of fact in this case, you must wholly
disregard it.

 The record in this case fails to show that Appellant made a timely objection to the judge's
comment. Because she failed to object, Appellant waived her complaint on appeal. See Gibbs, 7
S.W.3d at 178; Williams, 834 S.W.2d at 505. However, even if the judge's comment was error and
was not waived, Appellant has not shown that the instruction to disregard any comments made by
the judge did not cure the error, if any. Accordingly, Appellant's second issue is overruled. 


Evidentiary Sufficiency

 In her third and fourth issues, Appellant argues that the evidence was legally and factually
insufficient to support a conviction. Appellant contends that the State failed to prove the required
culpable mental state. Further, Appellant asserts that the evidence fails to prove she committed any
crime, and that suicide, which the State failed to disprove, was as likely as homicide. The State
contends that there was sufficient circumstantial evidence to support the jury's verdict. Further, the
State argues that the evidence does not support any conclusion other than that Appellant murdered
her husband. 

Standard of Review

 "Legal sufficiency is the constitutional minimum required by the Due Process Clause of the
Fourteenth Amendment to sustain a criminal conviction." Escobedo v. State, 6 S.W.3d 1, 6 (Tex.
App.-San Antonio 1999, no pet.) (citing Jackson v. Virginia, 443 U.S. 307, 315-16, 99 S. Ct. 2781,
2786-88, 61 L. Ed.2d 560 (1979)). The standard of review is whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. Jackson, 443 U.S. at
319, 99 S. Ct. at 2789; LaCour v. State, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000). The evidence
is viewed in the light most favorable to the verdict. Jackson, 443 U.S. at 319, 99 S. Ct. at 2789;
LaCour, 8 S.W.3d at 671. The conviction will be sustained "unless it is found to be irrational or
unsupported by more than a 'mere modicum' of the evidence." Moreno v. State, 755 S.W.2d 866,
867 (Tex. Crim. App. 1988). The jury is the sole judge of the credibility of witnesses and of the
weight to be given their testimony. Barnes v. State, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994). 
Any reconciliation of conflicts and contradictions in the evidence is entirely within the jury's
domain. Losada v. State, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). If a reviewing court finds
the evidence legally insufficient to support a conviction, the result is an acquittal. Tibbs v. Florida,
457 U.S. 31, 41-42, 102 S. Ct. 2211, 2217-18, 72 L. Ed. 2d 652 (1982). 

 After a reviewing court has found that the evidence is legally sufficient to support the verdict,
the court may go forward with a review of the factual sufficiency of the evidence. Clewis v. State,
922 S.W.2d 126, 133 (Tex. Crim. App. 1996). In reviewing the factual sufficiency of the evidence,
a court examines all the evidence "without the prism of 'in the light most favorable to the
prosecution' and sets aside the verdict only if it is so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust." Id. at 134. The court must inquire whether a neutral
review of all the evidence, both for and against the verdict, establishes that the proof of guilt is so
manifestly weak as to undermine faith in the jury's resolution, or the proof of guilt, although
sufficient if taken alone, is greatly offset by conflicting proof. Johnson v. State, 23 S.W.3d 1, 11
(Tex. Crim. App. 2000).

 A proper deference should be demonstrated by the reviewing court in order to deter a court
from substituting its judgment for that of the fact finder, and any examination of the evidence should
not substantially interfere upon the fact finder's role as the exclusive judge of the weight and
credibility given to witness testimony. Id. at 7; Clewis, 922 S.W.2d at 133. Wrong and unjust
verdicts include ones in which the verdict is "manifestly unjust," "shocks the conscience," or "clearly
demonstrates bias." Santellan v. State, 939 S.W.2d 155, 165 (Tex. Crim. App. 1997). The
reviewing court examines all of the evidence in the record pertaining to the factual sufficiency
challenge, not just evidence confirming the verdict. Id. at 164. 

 In a criminal conviction, sufficiency of the evidence is determined by the elements of the
crime as defined by the hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240
(Tex. Crim. App. 1997). The correct charge "would be one that accurately sets out the law, is
authorized by the indictment, does not unnecessarily increase the State's burden of proof or
unnecessarily restrict the State's theories of liability, and adequately describes the particular offense
for which the defendant was tried." Id. The standard of review is the same for both direct and
circumstantial evidence cases. Davila v. State, 952 S.W.2d 872, 874 (Tex. App.-Corpus Christi
1997, pet. ref'd); Alex v. State, 930 S.W.2d 787, 789 (Tex. App.-Tyler 1996, no pet.). In a
circumstantial evidence case, it is not necessary that every fact point directly and independently to
the guilt of the accused. Beardsley v. State, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987). The
cumulative force of all the incriminating circumstances may be sufficient to warrant a conclusion
of guilt. Id.; Alex, 930 S.W.2d at 789. Further, we review the record for evidence to support a guilty
verdict on either of the paragraph allegations submitted to the jury. Davila, 952 S.W.2d at 875.

Elements of the Offense

 Appellant was convicted of murder, a first degree felony. The elements of the offense are
that (1) a person (2) intentionally or knowingly (3) causes the death of an individual or, alternatively,
that (1) a person (2) intends (3) to cause serious bodily injury and (4) commits an act (5) clearly
dangerous to human life (6) that causes the death of an individual. Tex. Pen. Code Ann. § 19.02
(b)(1), (2). A person acts intentionally with respect to a result of her conduct when it is her
conscious objective or desire to engage in the conduct or cause the result. Tex. Pen. Code Ann.
§ 6.03(a) (Vernon 2003). Further, a person acts knowingly with respect to the result of her conduct
when she is aware that her conduct is reasonably certain to cause the result. Tex. Pen. Code Ann.
§ 6.03(b). 

 To determine culpability, the jury is entitled to consider events that occurred before, during,
and after the commission of the offense. Davila, 952 S.W.2d at 875; Henderson v. State, 825
S.W.2d 746, 749 (Tex. App.-Houston [14th Dist.] 1992, pet. ref'd). Appellant's acts, words, and
deeds may also infer intent. Dues v. State, 634 S.W.2d 304, 305 (Tex. Crim. App. [Panel Op.]
1982); Davila, 952 S.W.2d at 875. Intent to kill may be inferred from the use of a deadly weapon
in a deadly manner. Adanandus v. State, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993). Further,
"[i]f a deadly weapon is used in a deadly manner, the inference is almost conclusive that [the
defendant] intended to kill." Id. (quoting Godsey v. State, 719 S.W.2d 578, 581 (Tex. Crim. App.
1986)). A firearm is a deadly weapon per se. Tex. Pen. Code Ann. § 1.07(a)(17)(A) (Vernon
2003); Davila, 952 S.W.2d at 875; Henderson, 825 S.W.2d at 749. 

Analysis

 The evidence shows that Appellant and Calvin were the only adults in their house at the time
of Calvin's death. Appellant and Calvin argued over money problems before his death. Further,
Appellant knew where Calvin kept the gun recovered at the scene. Appellant's testimony that she
attempted CPR was conflicting and not supported by the evidence. Cox testified that the jamming
of the recovered gun was characteristic of a female's weak grip. Bolesta observed a gunshot wound
to the head. He stated that the entrance wound was in the center of the back of Calvin's head,
without left to right deviation. Johnson testified the bullet fragment was from a .9 millimeter gun
and the fired cartridge case matched the gun recovered at the crime scene. Johnson also testified that
the gunshot wound was not a contact wound. Based on the physical evidence, Henderson did not
observe blood spatter on Calvin that was consistent with the wound. Further, the evidence did not
support Appellant's contention that Calvin was lying on his stomach, and Henderson was unable to
position a gun to the back of his head while lying on his stomach. In his opinion, the evidence
supported a homicide. Further, Judge Shamburger, Cox, and Henderson had never seen a gunshot
suicide wound to the back of the head while Judge Shamburger and Cox had only seen one non-contact gunshot suicide wound. Owens testified that Calvin believed Appellant was pressuring him
to change the beneficiary of his insurance policies. Appellant, as Calvin's beneficiary, was entitled
to the proceeds from Trane insurance policies, including a life insurance policy that did not include
a suicide exclusion, and other benefit plans. Williams testified that Appellant indicated her
willingness to leave and kill Calvin. 

 Based upon our review of the record and viewing the evidence in the light most favorable
to the jury's verdict, we conclude that a rational trier of fact could have found the elements of murder
beyond a reasonable doubt. Accordingly, Appellant's challenge to the legal sufficiency of the
evidence is overruled. 

 Having determined that the evidence is legally sufficient to support the verdict, we address
factual sufficiency. Appellant denied shooting Calvin and stated that she loved him. In her version
of the facts, she testified that Calvin's health was failing, that he committed suicide, and that she
attempted CPR. She also disagreed with the testimony of several witnesses. Cox admitted that there
was no gunshot residue, no bloodstain evidence, and no fingerprints connecting Appellant to
Calvin's shooting. Bolesta was able to maneuver a gun to the back of his head and successfully
achieve the path of Calvin's wound. Weckerling did not discover gunshot residue on Calvin's
fingernails. All of this evidence is favorable to Appellant. However, in reviewing the entire record,
both for and against the jury's verdict, we do not find that proof of Appellant's guilt is so manifestly
weak as to undermine faith in the jury's resolution, or that the proof of guilt, although sufficient if
taken alone, is greatly offset by conflicting proof so as to render Appellant's conviction clearly
wrong or manifestly unjust. Accordingly, Appellant's challenge to the factual sufficiency of the
evidence is overruled.


Conclusion

 Having overruled Appellant's issues, we affirm the judgment of the trial court.


 SAM GRIFFITH 

 Justice



Opinion delivered August 29, 2003.

Panel consisted of Worthen, C.J. and Griffith, J.

































(DO NOT PUBLISH)
1. A person commits the offense of murder if she intentionally or knowingly causes the death of an
individual, intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the
death of an individual, or commits or attempts to commit a felony, other than manslaughter, and in the course of and
in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, she commits or
attempts to commit an act clearly dangerous to human life that causes the death of an individual. Tex. Pen. Code
Ann. § 19.02(b) (Vernon 2003). Murder is a first degree felony. Tex. Pen. Code Ann. § 19.02(c) (Vernon 2003). 
2. The punishment range for a first degree felony is a term of imprisonment for life or for any term of not
more than 99 years or less than five years and, in addition, a fine not exceeding $10,000. Tex. Penal Code Ann.
§ 12.32 (Vernon 1994).