

# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-12-00602-CR

Michael Jason **TUCKER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Atascosa County, Texas
Trial Court No. 12-03-0067-CRA
Honorable Stella Saxon, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice
Dissenting Opinion by:  Patricia O. Alvarez, Justice

Sitting:       Karen Angelini, Justice
               Sandee Bryan Marion, Justice
               Patricia O. Alvarez, Justice

Delivered and Filed:  October 8, 2014

AFFIRMED

A jury found appellant, Michael Tucker, guilty on one count of aggravated sexual assault and two counts of indecency with a child. The jury assessed punishment at seventy-five years' confinement, seventy-five years' confinement, and twenty years' confinement respectively. On appeal, appellant challenges the sufficiency of the evidence, and he raises numerous issues alleging juror misconduct, error in the punishment phase jury charge, ineffective assistance of counsel, and improper jury argument. We affirm.

**BACKGROUND**

Appellant is the step-father of two girls, Ka and Ky, and the girls lived with appellant, their mother Sharla, and little sister CT.[1] Ka (who was eleven-years-old at the time of trial) testified appellant touched her with his hand in her private area, between her legs, where she peed. She said he touched her while they were in her room, and sometimes her sisters or mother would also be in the house. She said this happened two or three times a week, and the touching started when she was seven years old. Once appellant had her touch him over his clothes on his "private part." Ka said appellant would also sometimes give her long kisses "like boyfriend/girlfriend kisses." She also remembered that once, when she was about three years old, appellant put his "private part" in her mouth. She had thought she told her mother about this incident, but later remembered she told "Caroline from ChildSafe."

Ka made the first outcry to her mother when her mother came into Ka's room and said "it's truth day . . . has anybody been touching you or anything . . . ?" Ka told her mother that appellant had been touching her. When asked what happened next, Ka said her mother's friend ("Crystal") came to get her, and she stayed at the friend's house for a while. Ka never returned to her mother's house. Ka remembered going to ChildSafe where she was examined by a nurse. Ka said she did not speak to Ky about what happened.

On cross-examination, Ka read from a written statement she gave when she was nine years old. In her statement, she said she did not know what, if anything, her mother did when she told her mother that appellant had put his "private part" in her mouth. However, on the witness stand,

---

[1] To protect the identity and privacy of the children in this case, we identify the children and family members only by their initials or first name.

Ka admitted she had not told her mother about this incident, but she thought she had "[a]nd when [she] was nine [she'd] just gone with what [she] thought of . . . ."

Ka's sister, Ky, testified next. Ky (who was fourteen years old at trial) testified that from when she was about five years old until she turned twelve years old, appellant would lick her vagina. When she was seven and nine years old, she called that part of her body her "tutu." She said he would put his hands on her breasts. Ky said appellant also put his penis or his fingers inside her vagina. She said appellant would sometimes walk into the bathroom while she was showering. Appellant also would put her hands on his penis and tell her to rub it. Ky thought she was about six years old when she told her mother what was happening, and her mother did not believe her at first. When her mother said she did not believe her, Ky then told her mother that nothing happened because she was afraid appellant would do something. Ky said she told her mother again when she turned twelve years old because that is when she first realized that what appellant was doing was wrong. Ky said on this occasion, her mother had come into her room and asked her if anyone had ever touched her in an inappropriate way. Ky said "[w]e [then] went to school and we came home and we packed our stuff . . . [and] went to Crystal's house."

On cross-examination, Ky admitted she did not like appellant when he and her mother married, and she wanted her mother to get back together with her biological father. Ky also said she told Child Protective Services ("CPS") that she did not tell her mother "nothing happened." In her written statement, Ky stated everything started to happen with appellant when she was nine years old. In a second written statement given five days later, she said everything started when she was five years old. When asked what happened in the five days between the two statements, she explained "[t]his one says he's giving me a bath. And this one said he scared me." When counsel asked her, "[s]o it's just different things that are happening," she responded "yes."

Norma Jordan, who at the time was a sergeant investigator with the Atascosa County Sheriff's Department, testified she met with both girls and their mother, interviewed them, and then referred them to ChildSafe where the girls would be interviewed on video and given a medical examination.

Ka and Ky's mother, Sharla, testified she met appellant when she was a clerk and he was a sergeant at the Dominguez State Jail. They married when she was pregnant with CT, and Ka was five years old and Ky was three years old. She said the first outcry came from Ka when she was six years old. Sharla said she was in the laundry room when Ka "just blurted out that [appellant] had licked her tutu and I completely lost composure and I didn't know what to do." She said she told Ka they had to go to the police station "because I wanted to make sure that she was telling the truth." She said she and appellant had just married, and Ka was lying and getting into trouble at school, "[s]o I thought maybe it was, you know, kind of like an outcry retaliating, I guess, because we got married." She said Ka immediately changed her story to say "she was lying, you know, never mind, I'm just kidding." Nevertheless, Sharla made a report to CPS, and, after the investigation, CPS said Ka showed no signs of sexual abuse and dismissed the case.

Sharla became suspicious later when Ky's grades began to decline. Sharla said one day Ky's school principal called to say Ky had been in a fight at school. After some time passed, when Ky was nine years old, Sharla again noticed "some things that were occurring" with both Ky and Ka. Sharla decided to ask Ky if anyone had ever inappropriately touched her, and Ky responded that appellant had. Sharla then called Crystal and asked her to pick up Ky so that she [Sharla] could talk to Ka. Sharla then asked Ka if appellant had ever inappropriately touched her, and Ka said "yeah, Mom, I told you when I was six years old . . . ." Sharla then took Ka and CT to Crystal's house where she called CPS. The next day, Sharla went back to the house she shared with appellant and packed up all their belongings. They stayed at Crystal's house until the girls

finished the school year, and then they moved in with Sharla's mother with whom they lived for about a year until Sharla and the girls moved into their present house.

Sharla said that, when she and appellant were married, the family lived in a mobile home first, but later moved to a large house that was purchased for them by appellant's mother. Sharla explained that appellant's mother bought lottery tickets, gave each of her grandchildren a ticket to scratch off, and the ticket scratched off by Ky won the grandmother $2 million. Sharla said that because Ky scratched off the winning ticket, appellant's mother used some of the money to buy the large house as a gift for appellant and his family. When asked by the prosecutor whether she had ever (1) asked for money to make the case go away, (2) put ideas into the girls' heads, or (3) specifically spoke to the girls about what happened other than the initial outcry; Sharla replied "No."[2] Sharla denied asking for money for breast augmentation, liposuction, or a tummy tuck. She said she and appellant were still married and would not divorce until after the criminal trial. When asked whether she felt she was entitled to the house because Ky had the winning lottery ticket, Sharla denied thinking she was entitled to the house but she stated "when any of the other kids won $20, it was their $20. So why would it make a difference whether it was $2 million or $20." She admitted she felt she was entitled to a portion of the winnings.

The next witness to testify was Ginger Jordan, the sexual assault nurse examiner ("the SANE nurse") who was employed at ChildSafe and conducted the examination and evaluation of both Ka and Ky. Jordan said both girls were easy to speak with and cooperative. Ka told Jordan appellant first touched her when she was five years old, had just showered, and was lying on her bed "air drying" when appellant came into her room and started to touch her genitals. Ka told Jordan the last incident occurred when she was ten or eleven years old and appellant put his mouth

---

[2] The prosecutor prefaced these questions with the statement: "Let's talk a little bit about some things that have [been] said to the jury."

on her genitals. She said this happened "a lot." Ka did not mention digital penetration or that appellant touched her breasts. Jordan said the results of Ka's medical examination were all normal, but she did not find that unusual because tissue in the genital area heals very quickly. No rape kit was done because more than a year had passed since the last incident.

Ky told Jordan appellant touched her with his hands more than once and had asked her to rub him. Ky did not mention digital penetration or any genital-to-mouth touching. Jordan said the results of Ky's medical examination were all normal, but she did not find that unusual because in the majority of exams she has done in the past, most results are normal.

Next, Dr. Nancy Kellogg, a child abuse pediatrician, testified she was the medical director at ChildSafe when Ka and Ky were examined. Kellogg stated that most of the children seen at ChildSafe have a normal examination, with only about ten percent having any medical findings. Kellogg explained children often do not outcry immediately because they are afraid, or they do not know what will happen to their family. She said if a child must tell multiple people what happened, it is not uncommon for the child to tell a slightly different story each time, especially if the people asking the questions all have a different purpose for their questions.

Caroline Briones, the forensic interviewer at ChildSafe, testified next. Briones described Ka as reserved, shy, and hesitant. She described Ky as more forthcoming.

The State's final witness was DT, appellant's daughter from his first marriage. The trial court had earlier ruled DT could testify to rebut a defensive theory. At the time of trial, DT was eighteen years old, and lived with her mother and step-father. DT could not remember when her mother and appellant divorced, but she thought she might have been as young as four. After the divorce, she saw appellant every other weekend and for the month of July. She testified appellant "sexually molested" her when she was a child by kissing her and touching her vagina. She said the "inappropriate things" began before the divorce but she was too scared to tell anyone because

appellant threatened to kill her mother. DT admitted she had accused her step-uncle of touching her inappropriately because she was afraid appellant would do something to her mother and "so [she] tried to blame it on someone else, and he [the step-uncle] hadn't. But [she] said he had so they'd pay attention to [her] and take [her] to the doctor."

DT said appellant once asked her to masturbate him while he watched pornography, he would also kiss her, put his finger inside her, and get into the shower with her. DT said appellant touched her from the time she was little until he married Sharla. DT said she never spoke with Ka or Ky about what appellant did to her. She said they did not all get together and make anything up or coordinate their stories. At some point in time, Sharla asked DT's mother "if anything had ever happened," which then caused DT's mother to ask DT whether appellant had ever touched her. DT told her mother that he had. DT then had her interview at ChildSafe. On cross-examination, DT said she asked Briones, during her interview, whether appellant would go to jail because she did not think he should be free.

Appellant called two witnesses during his case-in-chief. One of the witnesses, Beverly Holland, a former friend of Sharla's, testified Sharla was a liar. When she first heard about the abuse, she was shocked and "almost thought he did it." But this initial perception changed because appellant was always with Beverly's own children and she was always with his children, and the children were in constant contact. She believed she was close enough to Ka and Ky that they would have told her if appellant had done something to them. The other witness, Nelda Diaz, a friend of appellant's mother, said she would visit with Ka and Ky when they came to visit their grandmother. Diaz said she believed if there had been anything wrong, the girls would have said something to their parents or grandparents.

Finally, appellant testified on his own behalf. He said his divorce from DT's mother was not "a very friendly divorce." He said he and his former wife had differences over disciplining

DT and, once, he and DT's step-father had a physical altercation. After this, his relationship with DT deteriorated. Appellant said DT, Ka, and Ky did not get along well together, and he thought DT saw the two younger girls as outsiders who took attention away from her. Appellant said Ka never accepted him as part of the family, but he and Ky got along.

Appellant denied ever penetrating or inappropriately touching DT, Ka, or Ky. On cross-examination, appellant was asked why everyone would lie and whether money was the reason:

Q. All of them are lying?
A. Yes, ma'am.
Q. For what reason? Money?
A. That's a theory.
Q. That's your theory?
A. Correct.
Q. How much money do you have, Mr. Tucker?
A. Not much.
. . .
Q. Okay. What money do you have that they're after?
A. I don't have any money.
Q. So how do we get to this theory of these girls have [sic] said all these things about you? For whose money?
A. I have access to my mom's money.
Q. Does your mom just funnel it to you freely?
A. Yes, ma'am.
Q. And so you think that's how they think they're going to get it?
A. I can't answer that. I don't know.
Q. It's your theory?
A. It's my theory.
Q. Explain it.
A. Part of the theory that this would back up is the fact that during the preliminary portion of Sharla's and [my] divorce Sharla was expecting 16 to 18 hundred dollars a month for one child and spousal support.
Q. Okay. So your theory is that she was expecting or wanting a large amount of money?
A. Yes, ma'am.
Q. For child support or spousal support?
A. Yes, ma'am.
Q. So Sharla went and got her daughters to make up a story.
A. That's a theory.
Q. That's your theory?
A. Yes, ma'am.
. . .

> Q. Okay. Does it sound reasonable to you that [Ka and Ky] would go and tell law enforcement what happened, go to ChildSafe and tell them what happened, talk to Ginger Jordan and tell them what happened, come here and tell twelve strangers what happened over $1,600 or $385?
>
> A. I don't know.
>
> Q. Well, you have to know. It's your theory. Does that sound reasonable to you?
>
> A. I think they were influenced by their mother then, yes.

On re-direct examination, appellant answered affirmatively when asked if he thought there were abandonment issues, feelings of rejection, and feelings that he was a "lousy father." He agreed it was not unreasonable for a child to side with a care-giving mother.

## ADMISSION OF DT'S TESTIMONY

Before DT testified, the trial court heard arguments about the admissibility of her testimony. The State argued it wanted to bring in DT's testimony to rebut appellant's defensive theory that Ka and Ky had been coached for financial gain on the premise that DT, who was not under Sharla's influence, testified to a similar sexual assault by appellant. Over appellant's objection, the trial court allowed her testimony.

We first address appellant's two complaints that the trial court erred in admitting DT's testimony on the grounds that appellant did not open the door to its admission, and the prejudicial effect of DT's testimony outweighed its probative value. We review a trial court's decision to admit evidence under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the trial court's ruling is within the zone of reasonable disagreement, we will affirm. *Id.*

### A. Opening the Door

Appellant asserts trial counsel's opening statement outlined evidence he believed the jury would hear at trial, including evidence that Sharla was using the criminal case to improve her position in the couple's pending divorce and that Sharla was using the girls as leverage to get

money. However, appellant contends, counsel's strategy later shifted and counsel did not introduce the hinted-at evidence. Therefore, appellant concludes the door was never opened to allow DT's testimony to rebut a defensive theory because no such theory was advanced. We disagree.

"Although a defensive opening statement is not itself evidence, it does inform the jury of 'the nature of the defenses relied upon and the facts expected to be proved in their support.'" *Bass v. State*, 270 S.W.3d 557, 563 n.7 (quoting TEX. CODE CRIM. PROC. ANN. 36.01(a)(5) (West 2007)). "[A] defense opening statement, like that made in this case, opens the door to the admission of extraneous-offense evidence, like that admitted in this case, to rebut the defensive theory presented in the defense opening statement." *Id.*; *see also Powell v. State*, 63 S.W.3d 435, 438-40 (Tex. Crim. App. 2001) (in prosecution for indecency with a child, defendant's opening statement that he lacked opportunity to molest the complainant under the circumstances of the charged offense opened the door to admission of extraneous-offense evidence that defendant molested others under almost identical circumstances to rebut defendant's lack of opportunity defensive theory).

Even if counsel's opening statement did not open the door to DT's testimony, we disagree with appellant's contention that his defensive theory never materialized at trial. Appellant's entire defense rested on his contention that Ka and Ky lied. As support for this contention, he testified Ka never accepted him as part of the family, money was his theory for why everyone lied because Sharla knew he had access to his mother's money, and Sharla got the girls to fabricate their stories.

Under these circumstances, we conclude appellant opened the door to DT's testimony.

**B.      Probative Value**

Texas Rule of Evidence 401 provides that evidence is relevant if it makes the existence of a fact that is of consequence to the determination of the action more probable than it would be without the evidence. TEX. R. EVID. 401. However, even relevant evidence is not admissible for

every purpose. *Moses*, 105 S.W.3d at 626. Rule of Evidence 404(b) allows evidence of extraneous offenses if the evidence has relevance apart from character conformity. *Id.*; *see* TEX. R. EVID. 404(b). Thus, evidence of other crimes, wrongs, or acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b); *see Moses*, 105 S.W.3d at 626. Rebuttal of a defensive theory is also one of the permissible purposes for which relevant evidence may be admitted under Rule 404(b). *Moses*, 105 S.W.3d at 626.

Appellant first contends the probative value of DT's testimony is inextricably linked to how well appellant's defensive theory was presented. According to appellant, his defensive theory was not supported by the evidence; therefore, DT's testimony had minimal probative value. As stated above, appellant's entire defense rested on his contention that Ka never accepted him as part of the family, money was his theory for why everyone lied because Sharla knew he had access to his mother's money, and Sharla got the girls to fabricate their stories. Appellant's testimony, coupled with Sharla's admission that she felt she was entitled to a portion of appellant's mother's lottery winnings, sufficiently raised the defensive issue that Sharla influenced the girls to lie about the charges against appellant. Therefore, DT's testimony was probative to rebut this defensive theory.

## C.    Prejudicial Effect

Even if evidence is relevant under Rule 401 and the purpose for which it is being offered is permissible under Rule 404(b), the evidence still may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.*; *see* TEX. R. EVID. 403. When the trial court exercises its discretion not to exclude the evidence by finding that the probative value of the evidence is not outweighed by the danger of unfair prejudice, we give deference to this decision. *Moses*, 105 S.W.3d at 627. We cannot substitute our own decision for

that of the trial court. *Id.* Therefore, in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, we do not conduct a de novo review and we "should reverse the judgment of the trial court rarely and only after clear abuse of discretion." *Id.* (quotations omitted).

When conducting a Rule 403 analysis, courts must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). It is the objecting party's burden to show that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Poole v. State*, 974 S.W.2d 892, 897 (Tex. App.—Austin 1998, pet. ref'd).

"'[P]robative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco*, 210 S.W.3d at 641. When the proponent of the evidence has other compelling or undisputed evidence to establish the proposition or fact that the evidence goes to prove, the probative value of the evidence will weigh far less than it otherwise might in the probative-versus-prejudicial balance. *Id.* For the reasons stated above, the trial court could have reasonably concluded the inherent probative force of the testimony of DT—who was not under Sharla's influence—was considerable because her testimony rebutted appellant's defensive theory that Sharla influenced Ka and Ky to

fabricate their allegations against him. For this same reason, the trial court could have reasonably concluded the State needed DT's testimony.

We agree that DT's testimony was prejudicial. But, under Rule 403, mere prejudice will not render the evidence inadmissible; instead, the admission of the evidence must be unfairly prejudicial. *See* TEX. R. EVID. 403. Unfair prejudice "refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Gigliobianco*, 210 S.W.3d at 641. For example, evidence might be unfairly prejudicial if it invokes the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id.* In view of Ka's and Ky's testimony, which appellant concedes on appeal was "nearly unscathed by impeachment"—the trial court could have reasonably concluded that DT's testimony did not "unfairly" prejudice appellant. We also note the trial court instructed the jury both before DT testified and again in the jury charge that they could consider DT's testimony only for the purpose of impeaching a defensive theory. We presume the jury obeyed these instructions. *See Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003) (appellate courts presume jury follows instructions). Because the court did what it could to mitigate the improper influence of DT's testimony, the third factor at most only somewhat favors exclusion.

"Confusion of the issues" refers to a tendency to confuse or distract the jury from the main issues in the case. *Id.* For example, evidence that consumes an inordinate amount of time to present or answer might tend to confuse or distract the jury from the main issues. *Gigliobianco*, 210 S.W.3d at 641. DT's testimony was straight-forward and did not take an inordinate amount of time; therefore, this factor favors admission of the evidence.

"Misleading the jury" refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. *Id.* For example, scientific evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence. *Id.* DT's

testimony was not prone to this tendency because it concerned matters easily comprehensible by laypeople. Thus, this factor weighs in favor of admission.

Finally, "undue delay" and "needless presentation of cumulative evidence," concern the efficiency of the trial proceeding rather than the threat of an inaccurate decision. *Id.* DT was on the stand for a relatively brief period of time; her testimony occupies only about twenty-eight pages of a trial transcript that spans almost 125 pages. *Cf. Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (factor weighed in favor of admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony). Furthermore, her testimony was not repetitive. Therefore, this factor weighs in favor of admission.

In sum, only one factor weighed against admitting DT's testimony. In such a situation, especially bearing in mind that Rule 403 "envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value," *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009), the trial court could have reasonably concluded the probative value of DT's testimony was not outweighed by the danger of unfair prejudice. Thus, we cannot say that the trial court abused its discretion by admitting the testimony.

## SUFFICIENCY OF THE EVIDENCE

Appellant asserts the evidence is legally insufficient to support the four counts on which the jury found him guilty because the evidence consisted entirely of inconsistent testimony.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the charged offenses beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We examine legal sufficiency under the direction of the *Brooks* opinion while giving deference to the responsibility

of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318-19).

The testimony of a child victim alone is sufficient to satisfy each element of the charged offense and support a conviction for aggravated sexual assault or indecency with a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a) (West Supp. 2013); *Hiatt v. State*, 319 S.W.3d 115, 121 (Tex. App.—San Antonio 2010, pet. ref'd). Also, "[c]hild victims of sexual crimes are afforded great latitude when testifying and they are not expected to testify with the same clarity and ability as is expected of a mature and capable adult." *Hiatt*, 319 S.W.3d at 121. In this case, although there may have been inconsistencies in Ka's and Ky's testimony, it was for the jury to resolve these inconsistencies, and the jury could choose to believe all, some, or none of the testimony presented by the parties. *Zuniga v. State*, 393 S.W.3d 404, 413 n.2 (Tex. App.—San Antonio 2012, pet. ref'd). We conclude, after viewing the evidence in the light most favorable to the verdict, that it was rational for the jury to find appellant guilty on the four counts.

## PUNISHMENT PHASE

Appellant raises several complaints about the punishment phase of trial. First, appellant complains the trial court erred when it denied his motion for new trial because the jury engaged in misconduct when it assessed his punishment by considering DT's extraneous offense testimony when there was no instruction in the punishment charge limiting use of her testimony. Second, appellant complains the trial court erred by not sua sponte including an extraneous evidence instruction in the punishment charge, and the error caused him egregious harm.

### A. Juror Misconduct

In the guilt/innocence charge, the jury was instructed that DT's testimony could be considered only if the jury believed DT beyond a reasonable doubt, and then only for the purpose

of rebutting a defensive theory. The punishment charge contained no such instruction, and the jury was not instructed it could consider DT's testimony for the purpose of enhancing appellant's punishment. On appeal, appellant contends the jury engaged in misconduct when it used DT's testimony to enhance his punishment. Appellant had the burden of proving the allegation of juror misconduct. *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000). To prove juror misconduct, the defendant must establish that: (1) misconduct occurred; and (2) the misconduct resulted in harm to the defendant—that is, was detrimental to him. *Garza v. State*, 630 S.W.2d 272, 274 (Tex. Crim. App. 1982); *Escobedo v. State*, 6 S.W.3d 1, 8 (Tex. App.—San Antonio 1999, pet. ref'd).

Appellant relies on the testimony of the jury foreman, Jose Herrera, during the hearing on his motion for new trial for his contention that the jury engaged in misconduct by considering DT's testimony and disregarding the limiting instruction that her testimony be considered only to rebut a defensive theory when deliberating on his punishment. According to appellant, DT's testimony constituted outside evidence and an outside influence. At the new trial hearing, appellant's counsel first asked Herrera whether he remembered a special instruction regarding DT's testimony:

> A. I don't remember that. I don't think — I think we — we could not use [DT's] testimony whatsoever. We couldn't use her testimony for no reason other than I think dealing with the — with the punishment part is the only time we could use her testimony from what I recall.
>
> Q. Well, the record reflects otherwise, sir. The record reflects that there was a jury charge given in guilt/innocence . . . that said if you believe beyond a reasonable doubt that person's testimony . . . then it can be considered to rebut the defendant's theory that the other girls were lying. Do you know whether or not it was used for that purpose?
>
> A. From what I can remember we did not use [DT's] testimony whatsoever to determine whether the defendant was guilty or not guilty.
>
> Q. Was it discussed?

A. It was not discussed until the punishment phase of our deliberation[s] came into play.

Q. So you used it to sentence him?

A. Yes.

. . .

Q. Okay. All right. Just to back up then just based on what you remember. So what you're saying is that the jury only considered her testimony for punishment?

A. Exactly.

. . .

Q. Okay. So do you feel that [DT's] testimony that she was also victimized did it lead to additional years in his sentence?

A. Yes.

Following the hearing, the trial court denied appellant's motion for new trial.

The State asserts Texas Rule of Evidence 606 bars consideration of Herrera's testimony. Rule 606 provides generally that a juror may not testify "as to any matter or statement occurring during the course of the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." TEX. R. EVID. 606(b). "Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes." *Id.*

However, the State did not object during the new trial hearing to Herrera's testimony. Therefore, the applicability of Rule 606(b) is not before us and we will consider Herrera's testimony. *See Bader v. State*, 777 S.W.2d 178, 180-81 (Tex. App.—Corpus Christi 1989, no pet.) (holding same); *see also Lee v. State*, 791 S.W.2d 141, 142 n.* (Tex. Crim. App. 1990) ("It may be the court of appeals did not consider admissibility of the evidence under Rule 606(b), supra, for

the simple reason that the State waived any objection on that basis. If that is the case, the court of appeals should make its rationale more explicit upon remand.").

Because DT did not testify during the punishment phase, we cannot say it was error to "admit" her testimony. Appellant's argument on appeal, instead, focuses on the manner in which her testimony was considered. Appellant first asserts the jury engaged in misconduct by considering DT's testimony because her testimony was "outside evidence" and an "outside influence." We disagree because DT's testimony was offered during the guilt/innocence phase. *See McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (defining "outside influence" as used in Rule of Evidence 606(b) as "something originating from a source outside of the jury room and other than from the jurors themselves").

Also, extraneous offense evidence may be offered during the punishment phase. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (West Supp. 2013). Appellant does not argue on appeal that DT's testimony would not have been admissible during the punishment phase of his trial. The punishment charge allowed the jury to consider "all facts shown by the evidence admitted in evidence . . . in the full trial . . . ." Therefore, under these circumstances, we do not consider DT's testimony to be either "outside evidence" or an "outside influence."

We next consider appellant's argument that his motion for new trial should have been granted because the jury used DT's testimony to enhance his punishment, rather than to impeach a defensive theory. The State asserts the questioning of Herrera by appellant's attorney (the State asked no questions), did not go far enough in describing what or how the jury used DT's testimony in assessing punishment. We do not agree with the State's contention because Herrera unequivocally testified DT's testimony resulted in additional years added to appellant's punishment. However, we do not agree with appellant that the trial court erred in denying his

motion for new trial because, on this record, even if the jury improperly considered DT's testimony, we conclude appellant did not establish harm.

"The sentencing process consists of weighing mitigating and aggravating factors, and making adjustments in the severity of the sentence consistent with this calculus." *Milburn v. State*, 15 S.W.3d 267, 270 (Tex. App.—Houston [14th Dist.] 2000), *vacated and remanded on other grounds*, 3 S.W.3d 918 (Tex. Crim. App. 1999). Article 37.07, section 3(a)(1) allows for admission of any evidence the trial court "deems relevant to sentencing." TEX. CODE CRIM. PROC. art. 37.07 § 3(a)(1). "The Legislature has expressly provided that 'relevant' punishment evidence includes, but is not limited to, both character evidence in the form of opinion testimony as well as extraneous-offense evidence." *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008). "Because there are no discrete fact issues at the punishment phase of a non-capital trial . . . the definition of 'relevant,' as stated in Rule 401 of the Texas Rules of Evidence, does not readily apply to Article 37.07." *Id.* "What is 'relevant' to the punishment determination is simply that which will assist the fact finder in deciding the appropriate sentence in a particular case." *Id.* "When the jury assesses punishment, it must be able to tailor the sentence to the particular defendant, and relevance is simply 'a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case.'" *Id.*

Nothing in Herrera's testimony indicates the degree to which appellant's punishment was enhanced based upon DT's testimony. As discussed in more detail below, the jury assessed punishment on the two most serious counts—aggravated sexual assault—at less than the maximum, and did not assess fines on any of the four counts. Also, the evidence, even without DT's testimony, was more than sufficient to justify the sentences. On this record, we cannot conclude the trial court abused its discretion in denying appellant's motion for new trial based on juror misconduct.

**B.      Jury Instruction**

Appellant next asserts the trial court erred by not sua sponte instructing the jury in the punishment charge that it could consider evidence of two extraneous offenses only if the jury believed the testimony about the extraneous offenses beyond a reasonable doubt.   Appellant contends this error caused him egregious harm.

DT's testimony was the only evidence of an extraneous offense presented during the guilt/innocence phase.   In the guilt/innocence charge, the jury was instructed that it could not consider any extraneous offense evidence "for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same for the purpose of impeaching a defensive theory, if any, of the defendant in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose."   The punishment charge did not contain any specific limiting instruction, but instructed the jury that it "may take into consideration all the facts shown by the evidence admitted in evidence before you in full trial of this case and the law as submitted to you in this charge."   During the punishment phase, Sharla testified she saw videos of men having sex with children on appellant's laptop computer,[3] and Herrera testified the jury considered DT's testimony during the punishment phase.   Under these circumstances, appellant contends the trial court should have sua sponte included an extraneous evidence instruction in the punishment charge.

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).   Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal.

---

[3] Sharla did not testify about the videos during the guilt/innocence phase.

*Id.* at 731-32. Section 3 of Texas Code of Criminal Procedure article 37.07 provides that, during the punishment phase of trial,

> evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to . . . any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. art. 37.07 § 3(a)(1).

Article 37.07 also requires that the charge to the jury at punishment include any "additional written instructions as may be necessary." *Id.* § 3(b). Although section 3(a) of article 37.07 does not expressly require a jury instruction regarding evidence of unadjudicated extraneous offenses admitted at the punishment phase of trial, such an instruction is "logically required" to enable the jury to properly consider such evidence under the article's prescribed reasonable-doubt standard. *Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000).

Section 3(a)(1)'s requirement that the jury be satisfied of the defendant's culpability in the extraneous offenses and bad acts is the "law applicable to the case" in the non-capital punishment context. *Id.* at 483-84 (noting that "the law applicable to the case" requires sua sponte submission); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007) (requiring trial court to deliver to the jury "a written charge distinctly setting forth the law applicable to the case"). Therefore, we conclude the trial court's failure to include a reasonable doubt instruction was error. Because appellant failed to object to the written charge, we next examine the record to determine whether he suffered "egregious harm."

Appellant contends the trial court's failure to include a limiting instruction resulted in egregious harm because the jury increased his sentence. Appellant contends his sentence on two

counts at the maximum penalty and near the maximum penalty on two other counts was not the result of a fair and impartial trial.

When, as here, a defendant does not object to the charge error, his convictions are subject to reversal on appeal only if he has suffered "egregious harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). Egregious harm is established if the record shows that the defendant has suffered "such harm that [his] trial was not fair or impartial." *Id.*; *see Cosio v. State*, 353 S.W.3d 766, 776-77 (Tex. Crim. App. 2011). Charge error is egregiously harmful when it affects "the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Fulcher v. State*, 274 S.W.3d 713, 716 (Tex. App.—San Antonio 2008, pet. ref'd). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio*, 353 S.W.3d at 777; *Almanza*, 686 S.W.2d at 174. However, "we do not require direct evidence of harm to establish egregious harm." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

When the error is an omission of a reasonable doubt instruction, "[p]ossible harm to appellant because of the admission of evidence of extraneous offenses is not the issue . . . ." *Ellison v. State*, 86 S.W.3d 226, 228 (Tex. Crim. App. 2002). Instead, "[t]he harm which must be considered is the impact of the omission in the jury charge of a reasonable-doubt instruction." *Id.* In *Ellison*, the defendant asserted the trial court erred by failing to instruct the jury sua sponte that, before it could use the extraneous-offense evidence against him, it must first find beyond a reasonable doubt that he had committed the offenses. *Id.* at 226-27. The court of appeals, after applying *Almanza*, held the evidence made the case for serious punishment significantly more persuasive to the jury, and it could not say with fair assurance that the sentence was not substantially affected by the error. *Id.* at 227. The Court of Criminal Appeals held the court of appeals correctly used the egregious-error standard of *Almanza*, but applied it to the wrong issue.

*Id.* The Court noted the "court of appeals' analysis appears to be based on a finding that the error was the admission of the evidence rather than the omission of the reasonable-doubt instruction." *Id.* The Court concluded the court of appeals' "analysis, therefore, [did] not properly apply the factors required by *Almanza* to the question of the impact of the omission of that instruction." *Id.* The Court remanded the cause to the court of appeals for an egregious harm analysis of the impact of the omission of the reasonable-doubt instruction. *Id.*

In assessing whether appellant was egregiously harmed by the omission of a reasonable doubt instruction in the punishment charge, we consider the following factors: (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of probative evidence; (3) the parties' arguments at voir dire and at trial; and (4) all other relevant information in the record. *Almanza*, 686 S.W.2d at 171. The *Almanza* analysis is fact specific and is done on a "case-by-case basis." *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013).

### 1. The Punishment Charge

The trial court failed to instruct the jury in its punishment charge to not consider the extraneous evidence unless it was proven beyond a reasonable doubt. However, the charge instructed the jury it could not and must not take into consideration, refer to, or allude to appellant's decision not to testify during the punishment phase. The charge also instructed the jury it was the exclusive judge of the facts proved, of the credibility of the witnesses, and of the weight to be given their testimony, but it was "bound to receive the law from the Court, which is herein given you, and be governed thereby."

### 2. Guilt/Innocence Voir Dire and Closing

During the guilt/innocence phase in the State's voir dire argument, the prosecutor told the jury that the burden never shifted to the defendant and the State had to prove its case beyond a reasonable doubt. The defense asked the jury to keep an open mind about the possibility of

children lying and the possibility of somebody putting a thought into a child's mind. The record reveals nothing remarkable about the State's brief opening statements. The defense began its opening with three words: "Jealousy, greed, revenge." Counsel said "the seed" was planted when Sharla first did not believe Ka's initial outcry, and the jury would hear evidence about how Sharla used the children as leverage to get money in their still-pending divorce. Counsel also told the jury Sharla realized appellant did not have the money; instead, his mother had the money.

During the State's closing argument during the guilt/innocence phase, the State explained to the jury why it heard from DT: "Because where is the jealousy, greed and revenge that you heard about in opening statement? If that is from Sharla then why in the world would that have anything to do with what he did to DT? And that is why she was allowed to come in and tell you. Because it's allowed to rebut his theory. Because it's bull. She isn't even close to [Ka and Ky]." In his closing, defense counsel reminded the jury that only Ky and Ka were mentioned in the indictment. Counsel also reminded the jury it was not the defense's burden to show why Ky or Ka would lie, and if they did not believe the girls, then they could not convict simply because they believed DT. Counsel said Sharla "was always about getting money from this family." Counsel said the case against appellant relied entirely on the word of Ky and Ka, and "Mom has a motive to coach." Finally, defense counsel focused a significant portion of closing on DT and how the jury should not consider her testimony for the purpose of convicting appellant.

### 3. Punishment Closing

During its first punishment phase closing argument, the State began by telling the jury it could consider what appellant did to DT, Ka, and Ky over their lifespan when it was determining the appropriate amount of time that appellant deserved to spend in prison. The prosecutor then told the jury it could also consider Sharla's testimony about the child porn appellant had on his

computer before Ky outcried. The prosecutor said Sharla did not want to believe what appellant was capable of, and "[a]s a mother I find that incredible, but it happened."

Defense counsel appealed to the jury by reminding them of testimony from a jailer about how individuals convicted of aggravated sexual assault of a child and indecency with a child are treated in prison, and that five years "could be a death sentence in and of itself." Counsel said he was "okay" with the jurors believing the children, but he urged the jurors not to associate Sharla's testimony about the computer with assessing a higher punishment.

After defense counsel closed, the State again argued. The prosecutor told the jury appellant "has to be punished for what he's done, for the lives he's ruined, for all of them, for [Ka, Ky, and DT]." As to Sharla's testimony, the prosecutor told the jurors "[y]ou can say whatever you want about Sharla. I don't care, whatever you want to say about her. She should have, she could have, she would have, she didn't. . . . This isn't about Sharla. It's about that pedophile right there who likes little tiny girls." The prosecutor also stated, appellant "had at least, at least, 14 or 15 years of doing whatever he wanted to [DT], and then to [Ka] and then to [Ky] with no one stopping him."

### 4.     The Evidence

In addition to the evidence we have reviewed above, the jury also heard during the punishment phase testimony from Sharla about what she saw on appellant's computer, and testimony from five witnesses who testified on appellant's behalf. These five witnesses all characterized him as a good man who could never commit such crimes. Two of the witnesses, who had children, said they would trust appellant around their own children. One of the witnesses, Ashley Everett, described appellant "as the love of [her] life," and she said "it's a tragedy that he is caught up in a mess with carnival-like people." She also said DT "bragged [on her public Facebook page] about what she's doing to her father."

### 5.    Other Circumstances

"In addressing other relevant information, we may consider the severity of the punishment assessed, which may indicate egregious harm in some situations." *Martinez v. State*, 313 S.W.3d 358, 369 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (appellant received life sentence, the maximum allowed). "However, a maximum punishment alone does not indicate egregious harm." *Id.* (holding there is no egregious harm if jury would still have assessed life sentence, even if properly instructed to consider only extraneous offenses if they first found that appellant committed those offenses beyond a reasonable doubt).

In this case, the punishment charge informed the jury that punishment for aggravated sexual assault of a child was for a term of not less than five years nor more than life or ninety-nine years, with a possible fine not to exceed $10,000. The punishment charge informed the jury that punishment for indecency with a child by contact was for a term of not less than two years nor more than twenty years, with a possible fine not to exceed $10,000. The jury was told that in fixing punishment, it could consider all the facts shown by the evidence admitted in the full trial and the law as it was submitted to them. The jury assessed punishment on the aggravated sexual assault charges at seventy-five years' confinement for each of the two counts, with no fine. The jury assessed punishment on the indecency with a child by contact charges at twenty years' confinement for each of the two counts, with no fine.

### 6.    Conclusion

As noted above, our harm analysis does not focus on whether appellant was egregiously harmed by the admission of DT's testimony. *See Ellison*, 86 S.W.3d at 227-28. Instead, we analyze whether appellant was egregiously harmed by the omission of the reasonable doubt instruction in the punishment charge. *Id.* We do not believe he was. The jury heard the reasonable doubt/limiting instruction as to DT's testimony, albeit in the guilt/innocence charge. Although

Sharla's testimony during the punishment phase was not subject to a reasonable doubt instruction, both the State and defense were somewhat dismissive of her testimony in closing arguments. The jury assessed punishment on the two most serious counts—aggravated sexual assault—at less than the maximum, and did not assess fines on any of the four counts. And, the evidence, even without DT's and Sharla's testimony, was more than sufficient to justify the sentences. Had the proper instruction been included, the State's case would not have been any less persuasive. Therefore, we conclude the omission of the reasonable doubt instruction in the punishment charge did not egregiously harm appellant. Accordingly, we cannot conclude the trial court abused its discretion in denying appellant's motion for new trial based on the omission of the instruction.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant next asserts he received ineffective assistance of counsel because his trial attorney failed to fully convey the details of a twenty-year plea bargain, which appellant contends is "reasonably likely" he would have accepted.

At the hearing on appellant's motion for new trial, trial counsel testified he could not recall if he relayed an offer of eighteen or twenty years, but he thought it was eighteen with the aggravated charge. Counsel thought there was a prior offer of twenty-five years, which was rejected. Counsel testified the second offer (of either twenty or eighteen years) was extended "only because we needed [appellant] to consider something. He wouldn't consider any term as being acceptable. Any prison term, whether it was the minimum or not, was unacceptable." Counsel reiterated appellant "was of the position, that any day in jail would be a death sentence. And so we were not willing to compromise that issue. We were not willing to accept anything, [appellant] was not willing to accept anything that involved any type of prison time." Counsel agreed that a prison term was "the only thing the State ever offered." The only offer defense counsel relayed to the State was that appellant would accept probation on a non-sex-related offense, because appellant

did not want to register as a sex offender. During her argument, the prosecutor stated there were no offers from the State that fell below twenty or twenty-five years, and the only offer from appellant was for probation on a non-sex-related offense.

Appellant testified at the new trial hearing, and he stated the first offer relayed to him was for "thirty years aggravated." He said he told counsel it would not be necessary to discuss any plea bargains if "the numbers are going to be sky high." Appellant said he would have accepted a plea bargain for a lesser charge if one had been explained to him. Appellant agreed he "would have considered a lesser charge knowing that that may not carry a 3G aggravated designation."[4] Appellant could not recall discussing an eighteen or twenty year offer.

Based on this record, we cannot conclude appellant satisfied his burden of proof. To determine deficient performance, we look to the totality of the representation and the particular circumstances of each case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland v. Washington*, 466 U.S. 688-89 (1985). Our review of counsel's performance is highly deferential, and we indulge a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). In the plea-bargain context and to show the required but-for prejudice, a defendant must show that the outcome of the plea process would have been different with competent advice. *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). When a plea-bargain offer is rejected based on bad legal advice, the requisite prejudice is shown if the defendant shows by a reasonable probability that (1) he would have accepted the earlier offer if

---

[4] Texas Code of Criminal Procedure article 42.12, section 3g(a)(1) refers to certain enumerated felonies, including aggravated sexual assault and indecency with a child. A 3G felony carries certain consequences to the accused due to the serious nature of the offense. For example, a person convicted of a 3G felony offense is not eligible for community supervision from the judge. *See* TEX. CRIM. CODE PROC. ANN. art. 42.12 § 3g(a) (West Supp. 2013).

counsel had not given ineffective assistance, (2) the State would not have withdrawn the offer, and (3) the trial court would not have refused to accept the plea bargain. *Id.* at 1385; *Ex parte Argent*, 393 S.W.3d 781, 784 (Tex. Crim. App. 2013). "Both the performance and prejudice prongs of the *Strickland* ineffectiveness inquiry are mixed questions of law and fact, but the prejudice prong often contains 'subsidiary questions of historical fact, some of which may turn upon the credibility and demeanor of witnesses.'" *Riley v. State*, 378 S.W.3d 453, 458 (Tex. Crim. App. 2012). "Appellate courts must show almost total deference to a trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor." *Id.*

Although trial counsel's memory of the plea process was at times unclear, nothing in the record overcomes the strong presumption that counsel's performance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. Also, trial counsel clearly stated appellant would not have accepted any offer that included jail time, while appellant contended he would have considered a lesser charge that may not carry a 3G aggravated designation. The prosecutor stated no offer from the State fell below at least twenty years. Deferring to the trial court's credibility finding, we conclude appellant has not shown he would have accepted any plea offer that included jail time or that trial counsel gave ineffective assistance.

## JURY ARGUMENT DURING GUILT/INNOCENCE PHASE

Appellant asserts the prosecutor engaged in improper jury argument during the guilt/innocence phase by shifting the burden of proof to appellant. In defense counsel's opening statement, counsel argued that Sharla fabricated and implanted the alleged abuse into Ky's and Ka's heads in order to extort a large sum of money from appellant. During the State's closing, in response to the argument that the girls were coached by their mother, the prosecutor stated:

Nothing that they told you on the stand is inconsistent. Nothing. They have been saying their same story from the beginning. Licking me, touching me, putting his penis in me. All of that has stayed the same.

And Dr. Kellogg even told you. When we had Dr. Kellogg up here she said that she's examined 9,000 children. Disclosure is a process. It depends on who you're talking to. I may just tell a little bit because I don't know what you're going to say. I'm five, I'm eight, I'm nine. And then I may tell you a little bit more. But none of what they're saying is any different. They've just been able to give you more details.

*And so in order to find that this did not happen you have to find that this was coached, that this was an elaborate scheme . . . .*

At this point, defense counsel objected "misstatement of the law," and the trial court responded "[t]he jury will consider the charge of the court as to the law and the evidence that they heard." On appeal, appellant asserts the above emphasized language did not fall within the four acceptable areas of jury argument, and the trial court erred by not sustaining his objection. Appellant contends the argument shifted the burden of proof to him by suggesting to the jury that he had to prove his defensive theory in order to obtain a not guilty verdict, especially when he contends he did not present a defensive theory.

Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). In examining challenges to a jury argument, we consider the remark in the context in which it appears. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

In his opening argument during the guilt/innocence phase, defense counsel began with "Jealousy, greed, revenge." During her testimony, Sharla denied asking for money to pay for breast augmentation, liposuction, and a tummy tuck; however, she admitted she felt entitled to a portion of her mother-in-law's lottery winnings. During his testimony, appellant said he had a theory that money was the reason everyone lied, and that Sharla had Ka and Ky make up their

stories about him. In closing arguments, defense counsel said "Mom has a motive to coach." Because appellant raised the issue of whether Ka and Ky could be believed, we conclude the prosecutor's remarks were an answer to the arguments made by defense counsel and appellant's own testimony. Therefore, the trial court did not err by not sustaining appellant's objection.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice

Publish