**Robert GUEVARA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–98–00077–CR.**

Court of Appeals of Texas,
San Antonio.

May 19, 1999.

Michael C. Gross, San Antonio, for Appellant.

Alan E. Battaglia, Asst. Crim. Dist. Atty., San Antonio, for Appellee.

Before RICKHOFF, GREEN, and ANGELINI, JJ.

RICKHOFF, Justice.

A jury convicted Robert Guevara and his codefendant, Robert Escobedo, of two counts of aggravated sexual assault and sentenced them to twenty years on each count. In six issues presented Guevara disputes the legal and factual sufficiency of the evidence to support his conviction, the effectiveness of the assistance rendered by his trial counsel, and the trial court's decision not to grant him a new trial. We affirm.

### Facts

Because Guevara attacks the sufficiency of the evidence to support his conviction, a detailed rendition of the facts is in order.

Mary Smith [1] testified she met Escobedo about a month before the incident, in May 1996, when she was fourteen. She said she and Escobedo agreed to go to the movies in June and he agreed to pick her up on a street corner near her house. (Smith said she did not want Escobedo to know where she lived.) Smith said that when Escobedo arrived to pick her up, Guevara was with him; she said she was told they would be dropping Guevara off on the way to the movies. The trio went to Escobedo's house, a small garage apartment behind a larger house where Escobedo's grandparents lived. Escobedo said he was going to pick something up and went in the house. At that point, Smith said, Guevara told her to get out of the truck and come inside:

[SMITH]: then Robert told me to get off the truck and I told him no, I wasn't going to get off the truck. Then he grabbed me by my arm and tugged at me, he jerked at me and—

Q. What happened after he tugged at your arm?

[SMITH]: I told him to stop. At that point I saw like a shiny reflection. I wasn't really sure what it was.

Q. Where did you see the shiny reflection?

[SMITH]: I saw Robert with it in his— he had it in his hand.

Q. What did it look like?

[SMITH]: At first I wasn't really sure, but then I saw that it was a gun.

Q. What happened after you saw the gun?

[SMITH]: I got scared so I just listened to him and I got off the truck.

Smith also said that Guevara held the gun against her as they walked to the tiny apartment, where Escobedo was unlocking the door.

Smith said Escobedo forced her to have sex with him in the bathroom of the little house. After he was done, Smith said, Escobedo left and Guevara came in and asked what had happened. She said she told him; Guevara then asked if she knew anyone who wanted to buy purses. Then Guevara asked her to kiss him; she said Guevara then unzipped his pants and pulled hers down. Smith said that as Guevara forced himself on her, he held the gun against her jaw.

After Guevara was done, Smith said, she went into the front room, which contained

1. "Mary Smith" is the pseudonym adopted by the complainant for trial.

a television and Guevara's bed. She said Escobedo and Guevara forced themselves on her twice again. After they were done, Smith said, Guevara wanted to kill her, but Escobedo argued they should simply take her home, which they did. Smith said she did not tell anyone what happened until September. Smith said she picked Guevara and Escobedo out of a photo line-up. She also acknowledged she had been "fooling around" at a party with another boy and so was not a virgin at the time she reported the rape.

On cross-examination, Smith said she had talked to Escobedo several times between their meeting and the night of the rape. She said that at first she didn't realize the weapon she saw in Guevara's hand was a gun, but realized what it was when she got out of the truck. She said Guevara told her he was going to "blow away your brains" if she didn't shut up. She also admitted to running away from home several times.

Julio Ramirez, Jr. testified he was Smith's algebra teacher at Lanier High School. He said he noticed Smith, who along with her classmates had to qualify for his algebra class as part of Lanier's magnet school program, was often inattentive and distracted. He said when he saw her grades for the first period would not be good, he took her into the hallway during class early in October and started asking what was wrong. Ramirez said she eventually told him she was afraid of two boys because they had raped her. He said Smith told him that she had met one boy at a party, that he had asked her to go to the movies, that instead they went to his house—a small garage apartment—and watched TV and kissed, that he then got her in the bathroom and forced himself on her. Ramirez said she told him that after he was done, another boy came in and that the other boy held her down while the second boy raped her. He also said she fought back, but "they put the gun to my head again." At that point, Ramirez said, he referred Smith to a counselor at the school; two weeks later an officer came to the school and took his statement. Ramirez also said he believed Smith when she told him she had been raped.

Anthony L. Trevino, Jr. said he was the San Antonio policeman who took the report from Ramirez. He said he interviewed Smith for about an hour, about two weeks after her outcry statement to Ramirez. Trevino said after that interview Smith gave him the telephone number of the boy who had asked her out to the movies that night. He said the dispatcher looked up that number; knowing the address, he asked Smith and her mother to ride with him in the area and hopefully point out the place where the incident happened. He said Smith picked out the location immediately.

On cross-examination Trevino said Smith told him she first met the perpetrator at a movie theater off Loop 410. He said Smith told him she was threatened, but didn't say exactly where. He said that she told him Escobedo raped her in the bathroom; then Guevara came in and they took her to the bedroom and both raped her.

Clifford Joseph Cedotal said he was the San Antonio detective in charge of the case. He said he brought Smith in to the office and took a statement from her. He said he then called Escobedo and asked him to come in and give a statement. He said Escobedo claimed not to know Smith when he first showed him her photograph; when told his residence and his truck had been implicated, he said Guevara had been the one to assault Smith.

According to Escobedo's statement, Smith approached them; he said she looked "messed up, on drugs." According to the statement, Escobedo gave Smith his pager number; she paged him around 11:30 that night; that when he went to get

her she smelled of alcohol; that she was teasing and grabbing both Escobedo and Guevara; that Escobedo left her with Guevara in his room while he went to his parents' house to eat; and that when he came back she was crying and demanding to be taken home. Escobedo also said someone who sounded like Smith left him a telephone message: "We are going to [screw] you over."

Cetodal said Guevara later came in and provided a statement. According to Guevara's statement, they met Smith after playing basketball in the neighborhood; that Escobedo gave her his pager number; that they went to get her about 11 p.m., after she paged them; that no one had sex with Smith, although Smith told them she had condoms with her; that she got frustrated because they didn't want to have sex with her, and asked them to take her home.

Nancy Kellogg was the physician at the Alamo Children's Advocacy Center who examined Smith. She said Smith reported difficulty sleeping, an inability to concentrate, a fluctuating appetite and fear of going out after the incident; she also said Smith told her of an attempt to overdose on pills. Kellogg said these symptoms, as well as Smith's demeanor, were typical of women who had been raped which she had examined. She also reported a vaginal discharge after the rape, which Kellogg said also was consistent. Kellogg also said Smith told her she had had a consensual sexual encounter in August 1996.

Kellogg said Smith told her that Bobby "Escobel" had asked her out and was going to go to the movies when he said he had to go by his house to pick something else; that "his friend Robert" was there and threatened her with a gun; that Bobby raped her in the bathroom; that he used a condom for part of the time; that Robert "did the same things;" that they then went to Bobby's room where the as-

sault continued; and that the two dropped her off near her house.

Robert Guevara, Jr. said he and Escobedo were playing basketball on a neighborhood court the night of the incident. When they finished, Guevara said, they were driving away when Smith flagged them down and asked for a ride to a friend's house. Guevara said he had never seen her before that day. During the ride, Guevara said Smith asked if Escobedo had a girlfriend and got his pager number.

About 10:30 that night, Guevara said he went over to Escobedo's house and got on his telephone to talk to a woman he knew; he said he finally had to get off the phone because Smith was paging Escobedo. Guevara said the two of them went to pick up Smith, who he said wanted to party and to talk about family problems. Guevara said Smith appeared to have been drinking when they picked her up. He said they went back to Escobedo's house, where he got back on the phone. He said Escobedo talked to Smith for awhile, then went to use the bathroom, and that Smith followed him in there after a short time. Guevara said that when Escobedo came out he announced he was going up to his parents' house to eat; and that after Escobedo was gone, Smith told him Escobedo didn't want to have anything to do with her. When Escobedo came back, Guevara said, she asked to be taken home; so they both took her home.

Guevara denied either of them sexually assaulted Smith and denied either of them had a weapon.

Bobby Escobedo testified he and Guevara were playing basketball on the day in question; at the end of their game, as they were leaving, Escobedo said Smith flagged them down and asked for a ride to a friend's house. At the end of that ride, Escobedo said, he gave her his beeper number "to be nice." Later that night, after attending church services, Escobedo

said Smith paged him; so he and Guevara went to pick her up. Escobedo said Smith smelled like smoke and alcohol and put her hands on their legs; when they got to his house, Escobedo said, Smith went willingly.

Escobedo said Smith was flirting and talking about family problems in his house while Guevara talked on the telephone. At one point, Escobedo said, he went to urinate; after a short time Smith appeared in the bathroom with him and pulled out a condom; he told her he wasn't interested and left the restroom. He said he went to his grandparents' house in front to get something to eat at that point; when he came back, he said Smith demanded to be taken home. He also said she continued to flirt and at one point showed him a condom and smiled.

Escobedo denied raping Smith and denied anyone forced her to do anything that night. He also said Smith called just before he was called to the police station to tell him that "we are going to [screw] you over."

Louis Jaspers testified he was the pastor of St. Gabriel's, where Guevara was an altar boy for seven years. He said Guevara's character for truth was good. He said Escobedo also had been an altar boy, but for a short time several years before. Jaspers said he had not heard if Guevara was involved in the Kings gang.

Guevara retook the stand to deny membership in the Kings gang.

Julian Escobedo testified he was Robert Escobedo's grandfather. He testified his bedroom was 50 or 60 feet from his grandson's apartment, and that he did not hear any commotion or disturbance on the night in question.

Sofia Escobedo testified she was Robert Escobedo's grandmother. She said she heard no noises on the night in question.

Alberto Gutierrez testified he was Robert Escobedo's pastor. He said Escobedo was a nice young man who participated in church services.

Michelle Navarro said she was Escobedo's girlfriend and that she had never known him to be sexually aggressive toward her.

## Sufficiency of the Evidence

In his third issue Guevara argues the evidence is legally insufficient to sustain his conviction; in his fourth issue Guevara argues the evidence is factually insufficient to sustain his conviction. Because these require two different standards, we take each in turn.

### 1. Legal sufficiency

Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 320, 99 S.Ct. 2781; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App.1993), *cert. denied*, 511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 222 (1994). The evidence is examined in the light most favorable to the jury's verdict. *Jackson*, 443 U.S. at 320, 99 S.Ct. 2781; *Johnson*, 871 S.W.2d at 186. The standard is the same in both direct and circumstantial evidence cases. *Geesa v. State*, 820 S.W.2d 154, 162 (Tex.Crim.App.1991). All of the evidence is considered by the reviewing court, regardless of whether it was properly admitted. *Johnson*, 871 S.W.2d at 186; *Chambers v. State*, 805 S.W.2d 459, 460 (Tex.Crim.App.1991); *Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim.App.1988). A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *Tibbs*

*v. Florida,* 457 U.S. 31, 41–42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

■ The sufficiency of the evidence is measured against the offense defined by a hypothetically correct jury charge. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim. App.1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restricts the State's theories of liability, and adequately describes the particular offense for which the defendant is tried." *Id.*

■ The jury is the trier of fact, and is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony. *See* Tex.Code Crim.Proc. Ann. Art. 38.04 (Vernon 1979); *Penagraph v. State,* 623 S.W.2d 341, 343 (Tex.Crim. App. [Panel Op.] 1981). It is for the jury as trier of fact to resolve any conflicts and inconsistencies in the evidence. *Bowden v. State,* 628 S.W.2d 782, 784 (Tex.Crim. App.1982). Even where there is no conflict, the jury may give no weight to some evidence, and thereby reject part or all of a witness's testimony. *See Beardsley v. State,* 738 S.W.2d 681, 684 (Tex.Crim.App. 1987); *see also Chambers,* 805 S.W.2d at 461 (holding jury as judge of credibility may "believe all, some, or none of the testimony"). Because it is the province of the jury to determine the facts, any inconsistencies in the testimony should be resolved in favor of the jury's verdict in a legal sufficiency review. *Johnson v. State,* 815 S.W.2d 707, 712 (Tex.Crim.App. 1991) (quoting *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988)).

■ Guevara's specific complaint of insufficiency centers on the deadly weapon finding, which is a necessary element of aggravated sexual assault. *See* Tex. Penal Code Ann. § 22.021 (Vernon 1994). He claims the evidence supporting this finding was insufficient. We disagree. Both on direct and cross-examination Smith said she saw the weapon, recognized it as a deadly weapon, and that she was threatened with it. Taken in the light most favorable to the jury's verdict, we believe any rational trier of fact could have found all the elements of aggravated sexual assault, including the deadly weapon finding, given this testimony.

■ Furthermore, the state did not have to negate the "antique" exception contained in Tex. Penal Code Ann. § 46.01(3) (Vernon 1994). That statutory exception pertains only to weapons possession offenses, not assaultive offenses like the one before us today. *See Vaughn v. State,* 600 S.W.2d 314, 315 (Tex.Crim.App. 1980). The issue is overruled.

### 2. Factual Sufficiency

■ We now turn to whether the evidence was factually sufficient to sustain Guevara's conviction. *See Clewis v. State,* 922 S.W.2d 126 (Tex.Crim.App.1996). The factual sufficiency review process begins with the assumption that the evidence is legally sufficient under the *Jackson* standard. *Clewis,* 922 S.W.2d at 134 (citing *Stone v. State,* 823 S.W.2d 375 (Tex.App.— Austin 1992, pet. ref'd, untimely filed). The appellate court then considers all of the evidence in the record related to appellant's sufficiency challenge, not just the evidence which supports the verdict. *Id.* The appellate court reviews the evidence weighed by the jury which tends to prove the existence of the fact in dispute, and compares it to the evidence which tends to disprove that fact. *Santellan v. State,* 939 S.W.2d 155, 164 (citing *Ellis County State Bank v. Keever,* 915 S.W.2d 478, 479 (Tex. 1995) and *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994)). The court is authorized to disagree with the jury's determination, even if probative evidence exists which supports the verdict. *Clewis,* 922 S.W.2d at 133; *see also In Re*

*King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■■■■■ However, factual sufficiency review must be appropriately deferential so as to avoid the appellate court's substituting its own judgment for that of the fact finder. *Clewis,* 922 S.W.2d at 133. The court's evaluation should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony. *Santellan,* 939 S.W.2d at 164 (citing *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951); and *In Re Thoma,* 873 S.W.2d 477, 485 (Tex.Rev.Trib.1994)). We reverse only when the verdict is against the great weight of the evidence presented at trial so as to be clearly wrong and unjust, i.e., when the jury's finding is "manifestly unjust," "shocks the conscience," or "clearly demonstrates bias." *Clewis,* 922 S.W.2d at 135 (citing *Meraz v. State,* 785 S.W.2d 146, 149 (Tex.Crim.App.1990)). This standard grants the appropriate deference to the jury's verdict and prevents the reviewing court from substituting its judgment for that of the jury. *Santellan,* 939 S.W.2d at 164.

Considering the state of the record before us today, we cannot say this verdict is manifestly unjust or clearly demonstrates bias. We therefore overrule Guevara's fourth issue.

### Motion for New Trial

In his first issue Guevara argues the trial court abused its discretion in not granting a motion for new trial; in his second issue Guevara contests the court's decision not to grant his amended motion for new trial. We will consider these in turn.

**1. The Original Motion for New Trial**

■■■■ The gist of Guevara's complaint in his original motion for new trial is that the jury "received" evidence through juror Norma DeSoto, who stated in her affidavit and testimony that she shared her mother's experience with gang vandalism with the other jurors. DeSoto said she believed this experience encouraged other jurors to vote for a longer sentence.

■■■■ Jurors may not receive other evidence after they have retired to deliberate. Tex.R.App. P. 21.3(f). The defendant must show that the jury actually received other evidence and that the other evidence was detrimental. *Stephenson v. State,* 571 S.W.2d 174, 176 (Tex.Crim.App. [Panel Op.] 1978). Whether the jury has "received" other evidence is a fact question to be decided by the trial court and may also be a question of degree in some circumstances. *See Guice v. State,* 900 S.W.2d 387, 389 (Tex.App.—Texarkana 1995, pet. ref'd).

■■■■ Additionally, at a hearing on the motion for new trial, the trial judge is the trier of fact and the sole judge of the credibility of the witnesses. *Lewis v. State,* 911 S.W.2d 1, 7 (Tex.Crim.App. 1995). The trial court's ruling on a motion for new trial will not be disturbed absent an abuse of discretion. *Id.* When the basis of a motion for new trial is jury misconduct, and evidence at the hearing is conflicting, there is no abuse of discretion if the trial court overrules the motion for new trial. *Tollett v. State,* 799 S.W.2d 256, 259 (Tex.Crim.App.1990).

Here the defense attorneys called two jurors as witnesses at the motion for new trial hearing; the state called two jurors as witnesses. Their testimony was conflicting as to whether jurors improperly considered one juror's prior experience with gangs. Juror DeSoto contended that her information actually changed votes on the jury at punishment; juror Corey said the remark was an "off-the-wall conversation" which she told the other jurors to ignore.

Information which is treated as a "passing remark" does not require reversal. *Stephenson,* 571 S.W.2d at 176. This court elaborated on this observation in *Bratcher v. State,* 771 S.W.2d 175, 189 (Tex.App.—San Antonio 1989, no pet.). In *Bratcher,* part of a defendant's story was that he was watching a particular television program just before the murder. *Id.* at 179. One juror, who was eventually elected foreman, brought a television schedule and stated that he could not find the program referenced by defendant on the schedule. *Id.* at 185. While one juror admitted he may have "glanced" at the paper, the other seven jurors questioned said they did not. *Id.* After another juror pointed out that jurors didn't know what kind of cable or satellite service may have been available to defendant at the time, the "foreman" pocketed the schedule and admonished the others that it should not be considered. *Id.* This court, noting the "passing remark" standard in *Stephenson,* added that "this is particularly true where the remark is followed by corrective action" and overruled the issue. *Id.*

Here the foreman of the jury said she urged the other jurors to ignore juror DeSoto's remark about gang activity. Moreover, the other jurors' testimony did not conclusively show that Guevara was prejudiced by DeSoto's remark. Because of the state of this record, which includes conflicting testimony, we find the trial court did not err in overruling the motion for new trial. We therefore overrule Guevara's third issue.

**2. The Amended Motion for New Trial**

Guevara later filed an amended motion for new trial, which included an allegation that the jurors talked about probation in connection with Guevara's case. Although the original motion was still pending when the amended motion was filed, the trial court found that Guevara filed his amended motion outside the 30-day period during which an amended motion for new trial is due, found that Guevara did not have leave to file such an amended motion, and refused to consider it. *See* Tex.R.App. P. 21.4(b). We find the trial court did not err in this ruling. *See Pena v. State,* 767 S.W.2d 206, 207 (Tex. App.—San Antonio 1989, no pet.). We therefore overrule Guevara's fourth issue.

**Ineffective Assistance of Counsel**

In his fifth and six issues Guevara contends his trial counsel rendered ineffective assistance under both the state and federal constitutions. The test for ineffective assistance of counsel under the state and federal constitutions are the same, *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex.Crim.App.1986), and so we consider these issues together.

The criteria for assessing ineffective assistance of counsel has been set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* test focuses on reasonableness, measuring the assistance received against the prevailing norms of the legal profession. *Id.* at 690, 104 S.Ct. 2052. Counsel is presumed to have rendered adequate assistance, and it is incumbent on the defendant to identify those acts or omissions which do not amount to reasonable professional judgment and are outside the "range of professionally competent assistance." *Id.* To show prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The representation is to be evaluated as at the time of trial and not through hindsight. *Ex parte Welborn,* 785 S.W.2d 391, 393 (Tex.Crim.App. 1990). The key question becomes whether counsel's conduct so undermined the proper functioning of the adversarial process

that the trial cannot be relied on as having produced a just result. *See Castoreno v. State,* 932 S.W.2d 597, 604 (Tex.App.—San Antonio 1996, pet. ref'd) (citing*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052).

The constitutional right to counsel, whether appointed or retained, does not mean errorless counsel. *Castoreno,* 932 S.W.2d at 604. Whether the *Strickland* standard has been met is to be judged by the "totality of the representation" rather than by isolated acts or omissions of trial counsel, and the test is applied at the time of the trial, not through hindsight. *Wilkerson v. State,* 726 S.W.2d 542, 548 (Tex. Crim.App.1986), *cert. denied,* 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Banks,* 819 S.W.2d at 681. The burden of proving ineffective assistance by a preponderance of the evidence rests upon the convicted defendant. *McFarland v. State,* 845 S.W.2d 824, 842 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *Moore v. State,* 694 S.W.2d 528, 531 (Tex.Crim.App.1985).

Here Guevara's complaint centers on 1) trial counsel's failure to object to testimony during his character witness's cross-examination alleging that Guevara was a gang member; 2) trial counsel's failure to obtain a limiting instruction on Escobedo's testimony that Guevara had raped his sister. We are not convinced. We will take each allegation in turn.

### 1. Gang membership

Guevara complains that his counsel's decision not to object when prosecutors asked his character witness, Father Jasper, if he had "heard" that Guevara was a member of the Kings gang, constituted ineffective assistance of counsel. The State notes that the record already contained numerous references to gang membership: Smith admitted she had socialized with the "Las Angels" gang; she also said Guevara told her his family belonged to a Mafia gang which would kill her if she talked. In his direct testimony Guevara said Smith had asked whether they were members of a gang. More importantly, Guevara's counsel did object when, on cross-examination, the prosecutor asked Guevara if he was a member of the Kings gang; this objection was overruled. When the state ultimately failed to prove any gang connection, Guevara's counsel pointed this out to the jury in his closing argument.

In light of the fact that gang references were already in the record, and the fact that his prior objection had been overruled, we find Guevara has not overcome the strong presumption that his counsel rendered effective assistance in this instance.

### 2. Extraneous offense

More troubling is the allegation that Guevara's counsel permitted Smith to testify, without objection, that during their telephone conversation Escobedo told her that Guevara had raped Escobedo's sister. Escobedo's counsel elicited this information on cross-examination of Smith; it was hearsay as to Guevara. The state did not seek to prove this or introduce evidence. Therefore the standard for admitting and proving an extraneous offense do not apply. The question remains, however, whether this is an error and whether that error so prejudiced Guevara that our confidence in the outcome of this trial is undermined.

The state argues that Guevara's trial counsel could have decided not to object as part of his trial strategy. One strategy of both Escobedo and Guevara was to cast doubt on, and highlight inconsistencies in, Smith's testimony. The charge came up during cross-examination of Smith; she said Escobedo told her this during a telephone conversation which she recorded. Smith then admitted that she did not know

where a recording of this conversation might be.

We are not prepared to attribute this failure to object to trial strategy. More likely, given the suddenness of the charge leveled on cross-examination, the failure to object represents a mistake by Guevara's attorney. However, we do not believe this isolated mistake rises to the level of undermining our confidence in the outcome. We note, first, that prosecutors made no mention of the allegation at any point during the rest of the trial, minimizing the damage to Guevara that may have accrued from this. Contrary to Guevara's assertion, we do not believe the issue at that point suddenly became whether Guevara was a "bad person."

Second, we must also remember that a defendant is not entitled to errorless assistance of counsel, *Castoreno,* 932 S.W.2d at 604, and that we evaluate the effectiveness of the representation over the totality of the representation, without focusing in on isolated errors or omissions. *See Wilkerson,* 726 S.W.2d at 548.

Here Guevara's defense counsel vigorously cross-examined Smith and other witnesses and produced other witnesses on his client's behalf. We decline to find that Guevara's trial counsel rendered ineffective assistance. We overrule his fifth and sixth issues and affirm the judgment of the trial court.