# NO. 12-23-00301-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *RICHARD JAY CRAIN, II,* *APPELLANT* | § | *APPEAL FROM THE 145TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *NACOGDOCHES COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Richard Jay Crain, II appeals his conviction for occlusion assault involving family violence. In his sole issue, Appellant challenges the sufficiency of the evidence. We affirm.

## BACKGROUND

Appellant was charged by indictment with assault/family violence by impeding breath or circulation. Appellant pleaded "not guilty," and the matter proceeded to a jury trial. The jury found Appellant "guilty" and sentenced him to imprisonment for life.[1] This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his sole issue, Appellant challenges the sufficiency of the evidence to support the jury's verdict.

### Standard of Review and Applicable Law

The ***Jackson v. Virginia*** legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a

---

[1] Two prior felony convictions increased Appellant's range of punishment to that of a first-degree felony.

criminal offense that the State must prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010); *see Jackson v. Virginia*, 443 U.S. 307, 315-16, 99 S.Ct. 2785, 2786-87, 61 L. Ed. 2d 560 (1979). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315-16, 99 S.Ct. at 2789; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.—San Antonio 1999, pet. ref'd). We review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 902 n.19 (citing *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

The jury is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). A reviewing court must give full deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the jury resolved such facts in favor of the verdict and defer to that resolution. *Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, we determine whether any necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778. Circumstantial evidence is as probative as direct evidence in establishing the accused's guilt. *Hooper*, 214 S.W.3d at 13.

## Analysis

Appellant argues that the evidence is insufficient to support the jury's finding of guilt. Specifically, Appellant asserts that inconsistencies in the testimony of the victim, the victim's daughter, and Officer Ty Birdwell of the Nacogdoches Police Department render their testimony incredible.

Birdwell was dispatched to a residence after the victim, S.W., reported that Appellant assaulted her the previous night. S.W. told Birdwell that she and Appellant were previously in a relationship, and they are parents of the same child. Birdwell explained that S.W. said Appellant came to her residence at 4:00 a.m., and when she let Appellant into her residence, he appeared "angry or upset about something" as well as intoxicated. Birdwell explained when S.W. asked Appellant what was wrong, he jumped up from her dining table, "grabbed her around the neck

2

with both hands[,]" and applied enough force to her neck that she could not breathe. S.W. further told Birdwell that Appellant pushed her into a wall in the kitchen with sufficient force to break the paneling. Birdwell observed the broken paneling. Birdwell explained that the paneling was broken "at about [S.W.'s] shoulder height[,]" which was "consistent with what she was saying." S.W. told Birdwell that she fell to the floor, struck a table as she did so, and laid on the floor for several minutes while trying to catch her breath. Birdwell testified that S.W. told him she lost consciousness. S.W. told Birdwell that after she fell, Appellant briefly went into the bedroom, and then left the residence. S.W. later realized that Appellant took her cell phone from her bedroom.

According to Birdwell, S.W. had small "scratches on either side of her neck[,] kind of below her ears[,]" one side of her lip was bruised and slightly swollen, and her left arm and shin were bruised. Birdwell photographed S.W.'s injuries, and the photographs were admitted into evidence. Birdwell described S.W.'s voice as "kind of raspy[,]" and S.W. told him that her throat was sore and complained of difficulty speaking and swallowing. Birdwell explained that a person's "breathing can be cut off without any physical injuries[,]" and scratches can be caused by either the defendant's fingernails or by the victim's own nails "trying to pull somebody's hands away[.]" Birdwell opined that S.W.'s injuries and raspy voice were consistent with strangulation. S.W.'s daughter, K.W., told Birdwell that she did not see the assault because she was in her bedroom, but she heard her mother arguing with someone. Birdwell stated that K.W. related that when she entered the room, she saw S.W. on the floor, panicked, and wiped blood off of S.W.'s neck. Additionally, Birdwell said K.W. indicated that she did not know Appellant was in the residence until S.W. told her.

S.W. told Birdwell that Appellant later returned to the residence and knocked on her door, but she barricaded the door shut because she was still frightened. Appellant asked for a pair of his shoes and offered to return S.W.'s cell phone to her. According to Birdwell, S.W. reported that when Appellant began to walk back to the car, she opened the door, threw Appellant's shoes out, and quicky closed the door. Birdwell explained that when he spoke to S.W., she appeared to be afraid, and he opined that Appellant returning to her home "elevated that fear." In addition, S.W. told Birdwell that she believed she could not call 911 because her daughter's cell phone only worked on wi-fi, and the wi-fi at her residence was not working that day. Birdwell explained that many people "are not aware they can still call 911 without wi-fi." Birdwell also testified that it is common for victims to delay calling the police. During cross-examination, Birdwell explained

3

that he did not walk through all of S.W.'s residence, try to call S.W.'s cell phone, subpoena records for S.W.'s cell phone number, or check to see if the wi-fi at S.W.'s residence worked.

S.W. testified that she and Appellant have an off-again, on-again romantic relationship and share a child, and Appellant frequently came to her home to see and care for their child. According to S.W., at approximately 4:00 a.m. on March 10, 2020, she was watching television in her bedroom when Appellant knocked on her door, and she let him into her home. S.W. described Appellant as "very agitated" and explained that his "eyes were a little wild." She testified that Appellant frequently used drugs, so she believed he was high. S.W. returned to her room, and Appellant went to the kitchen. Appellant subsequently entered S.W.'s bedroom and asked for a cigarette, which she gave him. After a few minutes, Appellant returned and asked for another cigarette, and as he walked away, S.W.'s phone pinged with a notification. According to S.W., when her cell phone pinged, Appellant said, "this whore is going to make me kill her." S.W. testified that when she went into the kitchen and asked Appellant what was wrong, they got into a heated argument, and she did not know why Appellant was angry. She testified that Appellant jumped up, put both of his hands around her throat, and began to choke her. According to S.W., Appellant slammed her against the wall, causing the paneling to break, and she began to see white lights, could not breathe, and felt as though she would pass out. S.W. grabbed Appellant's fingers and pulled them back, and when she did so, he released her. S.W. fell, hit a table, landed on the floor, and tried to catch her breath. S.W. later discovered that Appellant took her two cell phones before leaving the residence.

S.W. testified that she eventually called out for her oldest daughter, K.W., who helped her off the floor. S.W. barricaded the door of her home with couches and a couple of chairs to prevent Appellant from reentering her residence. After the assault, S.W.'s throat was sore, she experienced difficulty swallowing, her voice was raspy and hoarse, and her skin was scratched and bruised. S.W. explained that she also had a bump on the back of her head from being pushed against the wall, her legs were bruised from falling onto the table, and after the assault, her neck and head were extremely sore. According to S.W., Appellant returned to her house the following day and asked for some of his belongings. When Appellant became loud and belligerent, S.W. decided to contact the police. When asked whether she allowed Appellant to reenter her home, S.W. testified, "I think I did let him come in. . . . I didn't have a problem [with] him getting the stuff. But once that loud talking started, I just couldn't take it." After Appellant left, S.W. called the police on

4

K.W.'s phone. S.W. agreed that twenty-one hours passed between the assault and her phone call to the police. S.W. did not recall whether she told Birdwell that Appellant entered her home when he returned.

K.W. testified that on the date of the assault, a banging sound awakened her, so she got out of bed and looked out the door of her bedroom. K.W. saw Appellant and S.W. Appellant eventually passed by K.W. to enter S.W.'s bedroom. According to K.W., Appellant "grabbed something" and then left the house. K.W. explained that she could not see into the kitchen from her room, but the area immediately outside the kitchen was visible. K.W. explained that when S.W. began to speak, her voice was raspy, and she was shaking. K.W. testified that her mother did not call her name. She saw that the wall behind her mother was "a little caved in." K.W. observed bruising on S.W.'s neck, chin, and underarm, as well as scratches and "outlines of the fingers[,]" and she explained that the scratches on S.W.'s neck were bleeding. K.W. stated that she gave a true statement to Birdwell, but some details were omitted from Birdwell's report. During cross-examination, K.W. denied telling Birdwell that she heard arguing or heard S.W. call for her. In addition, K.W. said that Appellant was still in the house when she came out of her bedroom. K.W. explained, "[h]e didn't leave until I was already going to the living room. I did see Crain."

Kim Riddle, a forensic nursing coordinator for Harold's House family crisis center, testified that victims of strangulation sometimes do not feel pain until later because they are experiencing adrenalin, and may be confused and unable "to give a good statement." According to Riddle, fifty percent of strangulation victims do not have visible injuries. In addition, Riddle explained that over fifty percent of victims experience a raspy or hoarse voice. Riddle opined that S.W.'s injuries and post-assault symptoms are consistent with strangulation, and because seeing white lights is common immediately before losing consciousness, she believed S.W. was close to losing consciousness during the assault.

To prove Appellant guilty of assault involving family violence by impeding breath or circulation, the State was required to prove that (1) Appellant and S.W. are parents of the same child and (2) Appellant intentionally, knowingly, or recklessly impeded S.W.'s normal breathing or blood circulation by applying pressure to her throat or neck. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2)(B) (West Supp. 2023) (defining occlusion assault); *see also* TEX. FAM. CODE ANN. § 71.003 (West 2019) (providing that "family" includes individuals who are parents of the

same child, without regard to marriage). A victim's testimony alone can provide sufficient evidence to support a conviction of felony assault of a family member by strangulation. *See Marshall v. State*, 479 S.W.3d 840, 845 (Tex. Crim. App. 2016). The jury may infer intent from circumstantial evidence, such as the defendant's acts, words, and conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

From the evidence presented, the jury could reasonably determine that Appellant strangled S.W. by applying pressure to her throat or neck, and that as a result, S.W. was unable to breathe. The jury heard and saw evidence that S.W. suffered injuries, including visible bruises and scratches. As sole judge of the weight and credibility of the evidence, the jury bore the burden of resolving any conflicts in the evidence and determining the credibility of the witnesses' testimony. *See Brooks*, 323 S.W.3d at 899*; see also Hooper*, 214 S.W.3d at 13. In doing so, the jury was entitled to believe S.W.'s testimony that Appellant impeded her breathing by applying pressure to her neck and throat with his hands.

Viewing the evidence in the light most favorable to the jury's verdict and giving full deference to the jury's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts, we conclude that a rational jury could have found each element of the offense beyond a reasonable doubt. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2)(B); TEX. FAM. CODE ANN. § 71.003; *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Hooper*, 214 S.W.3d at 13; *Brooks*, 323 S.W.3d at 902 n.19; *Clayton*, 235 S.W.3d at 778; *Penagraph*, 623 S.W.2d at 343. Accordingly, we overrule Appellant's sole issue.

### DISPOSITION

Having overruled Appellant's sole issue, we *affirm* the trial court's judgment.

BRIAN HOYLE
Justice

Opinion delivered July 3, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

6



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JULY 3, 2024**

**NO. 12-23-00301-CR**

**RICHARD JAY CRAIN, II,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 145th District Court

of Nacogdoches County, Texas (Tr.Ct.No. F2024877)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED, and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*