## NO. 12-23-00302-CR
## 12-23-00303-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *DWIGHT LEBRON HAMILTON,*<br>*APPELLANT* | § | *APPEAL FROM THE 114TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SMITH COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Dwight Lebron Hamilton appeals his convictions for aggravated robbery and aggravated kidnapping. In two issues, Appellant challenges the sufficiency of the evidence supporting his convictions and argues that the trial court improperly imposed duplicative court costs in one of the cases. We affirm in trial cause number 114-0718-23 (appellate cause number 12-23-00303-CR) and we modify and affirm as modified in trial cause number 114-0719-23 (appellate cause number 12-23-00302-CR).

### BACKGROUND

Appellant was charged by separate indictments with aggravated robbery and aggravated kidnapping. Appellant pleaded "not guilty" to both offenses, and the matters proceeded to a single jury trial.

The victim, C.M., testified that she has known Appellant for approximately thirty years. C.M. explained that she and Appellant were casual friends "for a good while[,]" and their relationship became sexual about one year ago. On the night before the offenses occurred, Appellant spent the night at C.M.'s residence. The next day, C.M. took Appellant to his residence before she went to work. Appellant left his keys in C.M.'s truck, and she told him she would bring the keys to him on her lunch break. According to C.M., Appellant did not answer the phone, so she went to his residence and left his keys underneath a trash can. C.M. testified that Appellant subsequently messaged her at work and told her that life as she knew it would change if she failed to comply with what he wanted her to do, and they argued. C.M. explained that Appellant believed she owed him for marijuana they smoked together, so she offered to pay for "half of the sack of weed" and sent Appellant $13 via Cash App.

When C.M. arrived home after work, she noticed that a trash can outside her door had been moved. According to C.M., Appellant installed a key padlock on the door of her residence, so Appellant knew the code to enter her home. Upon entering her home, C.M. realized that one of her dogs was missing. C.M. believed that Appellant took her dog, as no one else had a key to her apartment or knew the code. C.M. drove to Appellant's home, knocked on the door, and begged him to return her dog. C.M. threatened to call the police if he did not return her dog, and Appellant then whispered to her that if she called the police, he would kill her and her dog. C.M. stated that she already called the police, so she walked to her car and waited for them to arrive. When a police officer arrived, C.M. and the officer entered Appellant's home, and C.M. called for her dog, but her dog did not respond. Upon learning that the residence belonged to Appellant, the officer told C.M. that he could not be of further assistance.

C.M. returned to her vehicle, sat down, and sent text messages to Appellant asking him to return her dog. C.M. explained that her dog means everything to her, and she sent Appellant a message saying she would kill herself if he did not return her dog. According to C.M., Appellant's dog came out and jumped into her car, and she explained that the dog frequently did so. As C.M. continued to message Appellant, she noticed a red dot on her chest, and when she looked up, Appellant opened the door of her vehicle and began to beat her face and head with a gun. C.M. attempted to push her vehicle's ignition button, but she was dazed and unable to start the car. C.M. testified, "[Appellant] pushed me out of the driver's seat and started telling me he was taking me to kill me. . . . He asked me if I wanted to go to where my mom was buried and die, and he told

2

me he was going to take me to the woods and kill me." According to C.M., Appellant also said "he was going to send me to some guys and let them rape me, and then he was going to kill me." C.M. explained that after Appellant got into her car, Appellant's other dog also jumped into the vehicle.

Appellant began to drive C.M.'s vehicle and continued to hit her in multiple places, and C.M. believed she was going to die. As the vehicle approached a red light and began to slow down, C.M. jumped out of the vehicle. C.M. was bleeding profusely and her eye "was completely busted open." C.M. testified, "I just remember running into the highway, trying to wave my arms because I really couldn't see. I just remember waving my arms hoping a car didn't hit me." C.M. eventually ran into a gas station, where she knew an employee, and asked the employee to call for help. Another man helped C.M. get outside to wait for an ambulance and the police. C.M. was ultimately transported to the hospital, where she received stitches over her eye. She explained that her arm and ear were injured, and she still struggles to hear out of her left ear and cannot fully use her left arm and hand. C.M. testified that she did not give Appellant permission to take her car, did not want to be confined in the vehicle with Appellant, and Appellant used violence to take the vehicle from her.

After the incident, C.M. realized that Appellant was in relationships with other women. One woman had C.M.'s dog and returned the dog to C.M. after approximately two days. C.M. explained that she was without her car for three or four months and was unable to work for about six months due to her physical injuries and mental state. C.M. posted information about her car on Facebook and asked anyone who might have seen the vehicle to contact her or the police. Another woman with whom Appellant was in a relationship, S.H., eventually contacted C.M. about her car via Facebook Messenger. While C.M. was on the phone with S.H., a detective came to C.M.'s residence, and when C.M. told S.H. that she was speaking to a detective, S.H. told her that she would speak to the detective and tell him everything she knew. C.M. gave the detective her phone, and the detective interviewed S.H. by phone.

C.M. testified that she did not shoot Appellant or have a firearm with her when she went to Appellant's residence. She explained that she owned a revolver, and when she came home from the hospital, she realized that her gun was missing. During cross-examination, C.M. admitted that she was upset about her missing dog when she went to Appellant's residence, but she denied

3

having a gun with her. According to C.M., she and the officer who entered Appellant's house with her did not see any blood.

Officer Adam Riggle of the Tyler Police Department was dispatched to the gas station to which C.M. fled after the incident. Riggle testified that C.M. had "multiple, what appeared to be, deep lacerations on her face, blood all over her face and arms, and [was] in a very hysterical state." C.M. gave Riggle Appellant's name and reported that Appellant stole her vehicle. Riggle and other responding officers searched for Appellant without success. Photographs of C.M., as well as Riggle's body camera footage, were admitted into evidence and published to the jury.

Detective Sean Ratliff of the Tyler Police Department investigated the incident. Upon reviewing the photographs of C.M., Ratliff observed "substantial gashes to [C.M.'] face" that appeared to have been caused intentionally and were consistent with being struck with "[s]ome kind of a blunt object[.]" Ratliff eventually went to C.M.'s residence, and when C.M. answered the door, she was on the phone with S.H. Ratliff explained that S.H. wanted to speak with him on the phone and did so. After speaking with C.M. and ascertaining approximately where she jumped out of the vehicle, Ratliff sought surveillance videos from nearby businesses, and located footage that captured C.M. jumping from the vehicle. Ratliff believed he possessed probable cause to obtain a warrant to arrest Appellant for aggravated robbery and aggravated kidnapping. Ratliff explained that the aggravated robbery offense consists of using violence to steal C.M.'s vehicle, and aggravated kidnapping consists of taking C.M. against her will from one place to another and using physical violence while doing so.

After Appellant's arrest, Ratliff advised Appellant of his ***Miranda*** rights, and Appellant voluntarily spoke to Ratliff. Appellant claimed to be innocent and asserted that while C.M. was telling him to return her dog, she shot him. Appellant indicated that he hid when C.M. called the police because there was an active warrant for his arrest. Appellant told Ratliff that C.M. shot at his head, missed, and then shot his wrist. According to Appellant, another female arrived to pick him up, but he decided to look for his dogs, realized they were not in the house, and began to struggle with C.M. as she sat in her car. Appellant told Ratliff that C.M.'s head was accidentally struck "by her own gun[.]" Ratliff testified that Appellant said he realized he needed to seek medical treatment for the gunshot wound of his left hand, so he got into C.M.'s car and began driving it while she was still in the vehicle. Appellant told Ratliff that C.M. jumped from the car, after which he parked the car and walked home with his dogs. Ratliff testified that he obtained

4

surveillance video footage showing that Appellant was not attempting to reach a hospital. According to Ratliff, the officers who initially responded to Appellant's residence and entered with C.M. did not find any blood; rather, "they simply thought it was kind of a civil dispute about a dog and left."

S.H. testified that she was in a relationship with Appellant for approximately a year. Upon learning that Appellant was also in a relationship with C.M., S.H. contacted C.M. on Facebook and observed that C.M. "had a GoFundMe page[,]" and she explained, "you could tell [C.M.] was beaten really brutally in the face. Her eye was split. Her face and legs w[ere]all messed up, . . . and she told me what [Appellant] had done to her." S.H. saw that C.M.'s vehicle was missing, and she told C.M. that Appellant wanted to give her C.M.'s car as a birthday gift. According to S.H., Appellant ultimately told her that "[h]e shot hi[m]self with [C.M.'s] gun to make it look like [C.M.] was robbing him." Appellant told S.H. that he took C.M.'s dog because she stole $11 from him, "and he went to her house and took her dog and her gun." S.H. also testified that Appellant told her that he intended to kill C.M. that night, but "she jumped out of the car[,] and she ran." According to S.H., Appellant owns at least three firearms, one of which has a red laser beam.

Appellant testified that after he spent the night at C.M.'s home, she took him home the next day, but he left his keys in her vehicle. Appellant explained that he does not own a vehicle. According to Appellant, C.M. told him she would leave his keys under the trash can, but she did not. C.M. came to Appellant's home that night after work, knocked on the back door, asked where her dog was, and demanded that he return the dog. Appellant stated that C.M. was "very loud, and it seemed like she was very confused, deranged, just asking about her dog," and then she accused him of killing her dog. Appellant explained that C.M. eventually shot at him twice, and when a bullet struck him, he ran and hid behind his neighbor's truck.

According to Appellant, another female eventually arrived to pick him up, and they traveled a short distance before Appellant realized he needed to get his dogs. When he entered the residence, his dogs were not there, and he received a message from C.M. in which she told him she was in his driveway and threatened to kill herself. According to Appellant, he heard another gunshot and went toward the driver's side of her vehicle. Appellant recounted that C.M. pointed a gun at him, and while he struggled with her over the gun, C.M. was struck across her head. Appellant testified that C.M. moved to the passenger side of the vehicle, and he saw that his dogs were in the backseat. According to Appellant, C.M.'s testimony that he forced his way into her

car, threatened to kill her, and struck her with the gun while he was driving is untrue. Appellant explained that after C.M. jumped from the vehicle, he parked her vehicle at an apartment complex and walked home with his dogs. Moreover, Appellant claimed that S.H.'s testimony about things he allegedly told her is untrue. Appellant denied keeping C.M. in the car and not allowing her to leave, denied striking her with a firearm except when they struggled over a gun, and denied trying to steal her vehicle. Appellant further denied entering C.M.'s home when she was not there.

The jury found Appellant "guilty" of aggravated kidnapping and aggravated robbery and assessed punishment at thirty-seven years of imprisonment in each case. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In issue one, Appellant challenges the sufficiency of the evidence supporting his convictions. Specifically, with respect to the aggravated kidnapping, Appellant argues that he did not abduct or intend to abduct C.M. because he did not hide or secrete her, and he further asserts that he lacked intent to abduct C.M. With respect to the aggravated robbery, Appellant contends that the evidence is insufficient to demonstrate that he committed a theft or assaulted C.M.

## Standard of Review and Applicable Law

When evaluating the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902 n.19 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Robinson v. State*, 466 S.W.3d 166, 172 (Tex. Crim. App. 2015) (noting that standard for appellate review of evidentiary sufficiency applies to jury trials and bench trials). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson*, 443 U.S. at 315-16, 99 S. Ct. at 2786-87; *see also Escobedo v. State*, 6 S.W.3d 1, 6 (Tex. App.—San Antonio 1999, pet. ref'd). The factfinder is the ultimate authority on the credibility of witnesses and the weight to be given to their testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981); *see also Bonham v. State*, 680 S.W.2d 815, 819 (Tex. Crim. App. 1984). The factfinder may accept one version of the facts and reject another or reject any of a witness's testimony. *Penagraph*, 623 S.W.2d at 343.

A reviewing court must give full deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2781; *Brooks*, 323 S.W.3d at 899 n.13; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In addition, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Clayton*, 235 S.W.3d at 778.

"Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Rodriguez v. State*, 521 S.W.3d 822, 827 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011)). Each fact need not point directly and independently to the appellant's guilt, provided that the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Hooper*, 214 S.W.3d at 13. The factfinder may draw multiple reasonable inferences if each inference is supported by the evidence presented at trial. *Id*. at 15.

A person acts "intentionally" with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2021). A person acts "knowingly" with respect to the nature of his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id*. § 6.03(b). With respect to a result of his conduct, a person acts "knowingly" when he is aware that his conduct is reasonably certain to cause the result. *Id*. A jury may infer intent from an accused's acts, conduct, and remarks, as well as the surrounding circumstances. *Gant v. State*, 278 S.W.3d 836, 839 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Intent need not be proven by direct evidence; rather, "[i]ntent is almost always proven by circumstantial evidence." *Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi 2006, pet. ref'd); *see also Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (noting that proof of culpable mental state almost invariably relies upon circumstantial evidence). The factfinder may also infer intent from the method of committing the crime and the nature of the victim's wounds. *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999). When a reasonable inference supports the factfinder's

finding of a culpable intent, it is within the factfinder's province to determine which inference is most reasonable. ***Isassi v. State***, 330 S.W.3d 633, 643 (Tex. Crim. App. 2010).

## Analysis

To prove Appellant "guilty" of aggravated robbery, the State was required to prove that Appellant committed robbery and either caused serious bodily injury to C.M. or used or exhibited a deadly weapon.[1] *See* TEX. PENAL CODE ANN. § 29.03 (West 2019). To prove Appellant "guilty" of aggravated kidnapping, the State was required to prove that Appellant intentionally or knowingly abducted C.M. with the intent to inflict bodily injury on her or to terrorize her. ***Id***. § 20.04(a)(4), (5).

As recounted above, the jury heard C.M. testify that after she confronted Appellant about her dog at his residence, he pointed his gun at her while she sat in her vehicle in his driveway and then opened the door of her vehicle and began beating her face and head with the gun. The jury also heard C.M. testify that Appellant eventually pushed her out of the driver's seat, threatened to take her to another city and kill her, and Appellant began to drive C.M.'s vehicle while continuing to strike her. C.M. testified that she did not give Appellant permission to take her car, did not want to be confined in the vehicle with Appellant, and Appellant used violence to take the vehicle from her. The jury also heard C.M., Riggle, and Ratliff testify regarding C.M.'s injuries. Moreover, the jury heard C.M. deny shooting Appellant. Furthermore, the jury heard S.H. testify that Appellant told her he shot himself with C.M.'s gun, took C.M.'s dog from her home, and intended to kill C.M., but she jumped from the vehicle. The jury also heard S.H. testify that Appellant wanted to give her C.M.'s car. Lastly, the jury heard Ratliff testify that surveillance video footage shows that Appellant was not attempting to reach a hospital when C.M. jumped from the vehicle.

The jury heard Appellant testify that C.M. confronted him at his residence, accused him of killing her dog, and shot him. In addition, the jury heard Appellant testify that when he returned to his residence to get his dogs, he approached her vehicle after hearing another gunshot, and after C.M. pointed the gun at him, they struggled over the gun. The jury further heard Appellant testify that during the struggle, C.M.'s head was struck. Moreover, the jury heard Appellant testify that C.M. moved to the passenger side of the vehicle. Lastly, the jury heard Appellant testify that

---

[1] Section 29.02(a) provides that a person commits the offense of robbery if, while committing theft and with intent to obtain or maintain control of the property, he (1) intentionally, knowingly, or recklessly causes bodily injury to another or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PENAL CODE ANN. § 29.02(a) (West 2019).

C.M.'s testimony is untrue, and the jury heard him testify that he did not keep C.M. in the car, strike her with a firearm, or attempt to steal her vehicle. As sole judge of the weight and credibility of the evidence, the jury was entitled to reject Appellant's version of the events and accept C.M.'s version. *See **Penagraph***, 623 S.W.2d at 343.

Reviewing the evidence in the light most favorable to the trial court's judgment and giving full deference to the jury to weigh the evidence, to determine the witnesses' credibility, and to draw reasonable inferences from basic facts to ultimate facts, we conclude that a rational jury could have found Appellant "guilty" beyond a reasonable doubt of aggravated kidnapping and aggravated robbery. *See **Jackson***, 443 U.S. at 319, 99 S. Ct. at 2789; ***Clayton***, 235 S.W.3d at 778; ***Hooper***, 214 S.W.3d at 13; ***Penagraph***, 623 S.W.2d at 343; ***Gant,*** 278 S.W.3rd at 839; *see also* TEX. PENAL CODE ANN. §§ 20.04(a)(4), (5), 29.03. Accordingly, we overrule issue one as to both causes.

## ASSESSMENT OF DUPLICATIVE COURT COSTS AND FEES

In issue two, Appellant argues that the imposition of court costs and fees in the second case is improper because said court costs and fees are duplicative of those assessed in the first case. The State concedes that court costs and fees were erroneously assessed in trial cause number 114-0719-23. We agree.

### Applicable Law

The Texas Code of Criminal Procedure provides as follows:

(a) In a single criminal action in which a defendant is convicted of two or more offenses or of multiple counts of the same offense, the court may assess each court cost or fee only once against the defendant.

(b) In a criminal action described by Subsection (a), each court cost or fee the amount of which is determined according to the category of offense must be assessed using the highest category of offense that is possible based on the defendant's convictions.

TEX. CODE CRIM. PROC. ANN. art. 102.073(a), (b) (West 2018). In this context, we construe the phrase "in a single criminal action" to mean in a single trial or plea proceeding. ***Hurlburt v. State***, 506 S.W.3d 199, 203 (Tex. App.—Waco 2016, no pet.).

### Analysis

The record shows that the allegations and evidence of both offenses were presented in a single trial, or "criminal action." *See **id**.* at 203-04. Therefore, the trial court was authorized to

9

assess each court cost and fee against Appellant only once. *See* TEX. CODE CRIM. PROC. ANN. art. 102.073(a). Both aggravated kidnapping and aggravated robbery are first-degree felonies. TEX. PENAL CODE ANN. §§ 20.04(c), 29.03(b). When, as here, the convictions are for the same category of offense and the costs are the same, the costs and fees should be assessed in the case with the lowest trial court cause number. *See* ***Williams v. State***, 495 S.W.3d 583, 590 (Tex. App.—Houston [1st Dist.] 2016, pet. dism'd); *see also* ***Shuler v. State***, 650 S.W.3d 683, 690 (Tex. App.—Dallas 2022, no pet.).

The judgment in the case with the lowest trial court cause number, trial cause number 114-0718-23, shows an assessment of court costs and fees totaling $251.50, and the judgment in trial court cause number 114-0719-23 likewise shows the assessment of court costs and fees totaling $251.50. In both cases, the assessed court costs and fees included an arrest fee of $5.00, clerk of the court fee of $40, consolidated court fee of $133, county and district court technology fund fee of $4, county jury fund fee of $1, county records management and preservation fee of $25, county specialty court account fee of $25, courthouse security fund fee of $10, county judicial support fee of $0.60, state judicial support fee of $5.40, and a records management and preservation fee of $2.50.

We sustain Appellant's issue as to the duplicative court costs and fees assessed against him in trial cause number 114-0719-23 (appellate cause number 12-24-00302-CR). We have the authority to correct a trial court's judgment to make the record speak the truth when we have the necessary data and information to do so. ***Asberry v. State***, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Because we have the necessary data and information to correct the amount of court costs and fees in trial cause number 114-0719-23 (appellate cause number 12-12-00302-CR), we conclude that the judgment, the attached order to withdraw funds, and the bill of costs in said case should be modified to remove the duplicate court costs and fees totaling $251.50. *See id.*; *see also* TEX. R. APP. P. 43.2(b).

## DISPOSITION

Having overruled issue one as to both causes and having sustained issue two as to trial cause number 114-0719-23, we ***modify*** the trial court's judgment, Order to Withdraw Funds, and bill of costs in trial cause number 114-0719-23 (appellate cause number 12-23-00302-CR) to reflect that the amount of court costs and fees is $0.00. In all other respects, we ***affirm*** the trial

court's judgment in trial cause number 114-0719-23.  We *affirm* the trial court's judgment in trial cause number 114-0718-23 (appellate cause number 12-23-00303-CR).

**GREG NEELEY**
Justice

Opinion delivered August 29, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

11



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 29, 2024**

**NO. 12-23-00302-CR**

**DWIGHT LEBRON HAMILTON,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

---

Appeal from the 114th District Court
of Smith County, Texas (Tr.Ct.No. 114-0719-23)

---

THIS CAUSE came to be heard on the appellate record and brief filed herein, and the same being considered, it is the opinion of this court that the judgment of the court below should be modified, and as modified, affirmed.

It is therefore ORDERED, ADJUDGED, and DECREED that the judgment of the court below is **modified** to reflect that the amount of court costs and fees is $0.00; in all other respects, the judgment of the trial court is **affirmed**; and that the decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 29, 2024**

**NO. 12-23-00303-CR**

**DWIGHT LEBRON HAMILTON,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 114th District Court

of Smith County, Texas (Tr.Ct.No. 114-0718-23)

THIS CAUSE came to be heard on the appellate record and brief filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that the decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*